# SANTOSKY ET AL. *v.* KRAMER, COMMISSIONER, ULSTER COUNTY DEPARTMENT OF SOCIAL SERVICES, ET AL.

No. 80–5889.   Argued November 10, 1981—Decided March 24, 1982

746

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, POWELL, and STEVENS, JJ., joined.   REHNQUIST, J., filed a

dissenting opinion, in which BURGER, C. J., and WHITE and O'CONNOR, JJ., joined, *post*, p. 770.

*Martin Guggenheim* argued the cause for petitioners. With him on the briefs was *Alan N. Sussman.*

*Steven Domenic Scavuzzo* argued the cause *pro hac vice* for respondents. With him on the brief was *H. Randall Bixler. Wilfrid E. Marrin* and *Frederick J. Magovern* filed a brief for respondents Balogh et al.*

JUSTICE BLACKMUN delivered the opinion of the Court.

Under New York law, the State may terminate, over parental objection, the rights of parents in their natural child upon a finding that the child is "permanently neglected." N.Y. Soc. Serv. Law §§ 384–b.4.(d), 384–b.7.(a) (McKinney Supp. 1981–1982) (Soc. Serv. Law). The New York Family Court Act § 622 (McKinney 1975 and Supp. 1981–1982) (Fam. Ct. Act) requires that only a "fair preponderance of the evidence" support that finding. Thus, in New York, the factual certainty required to extinguish the parent-child relationship is no greater than that necessary to award money damages in an ordinary civil action.

Today we hold that the Due Process Clause of the Fourteenth Amendment demands more than this. Before a State may sever completely and irrevocably the rights of parents in

---

*Briefs of *amici curiae* urging reversal were filed by *Marcia Robinson Lowry, Steven R. Shapiro,* and *Margaret Hayman* for the American Civil Liberties Union Children's Rights Project et al.; and by *Louise Gruner Gans, Catherine P. Mitchell, Norman Siegel, Gary Connor,* and *Daniel Greenberg* for Community Action for Legal Services, Inc., et al.

Briefs of *amici curiae* urging affirmance were filed by *Robert Abrams,* Attorney General, *Shirley Adelson Siegel,* Solicitor General, and *Lawrence J. Logan* and *Robert J. Schack,* Assistant Attorneys General, for the State of New York; and by *Dave Frohnmayer,* Attorney General, *William F. Gary,* Solicitor General, and *Jan Peter Londahl,* Assistant Attorney General, for the State of Oregon.

their natural child, due process requires that the State support its allegations by at least clear and convincing evidence.

I

A

New York authorizes its officials to remove a child temporarily from his or her home if the child appears "neglected," within the meaning of Art. 10 of the Family Court Act. See §§ 1012(f), 1021–1029. Once removed, a child under the age of 18 customarily is placed "in the care of an authorized agency," Soc. Serv. Law § 384–b.7.(a), usually a state institution or a foster home. At that point, "the state's first obligation is to help the family with services to . . . reunite it . . . ." § 384–b.1.(a)(iii). But if convinced that "positive, nurturing parent-child relationships no longer exist," § 384–b.1.(b), the State may initiate "permanent neglect" proceedings to free the child for adoption.

The State bifurcates its permanent neglect proceeding into "fact-finding" and "dispositional" hearings. Fam. Ct. Act §§ 622, 623. At the factfinding stage, the State must prove that the child has been "permanently neglected," as defined by Fam. Ct. Act §§ 614.1.(a)–(d) and Soc. Serv. Law § 384–b.7.(a). See Fam. Ct. Act § 622. The Family Court judge then determines at a subsequent dispositional hearing what placement would serve the child's best interests. §§ 623, 631.

At the factfinding hearing, the State must establish, among other things, that for more than a year after the child entered state custody, the agency "made diligent efforts to encourage and strengthen the parental relationship." Fam. Ct. Act §§ 614.1.(c), 611. The State must further prove that during that same period, the child's natural parents failed "substantially and continuously or repeatedly to maintain contact with or plan for the future of the child although physically and financially able to do so." § 614.1.(d). Should the State support its allegations by "a fair preponderance of the evidence," § 622, the child may be declared permanently ne-

glected. § 611. That declaration empowers the Family Court judge to terminate permanently the natural parents' rights in the child. §§ 631(c), 634. Termination denies the natural parents physical custody, as well as the rights ever to visit, communicate with, or regain custody of the child.[1]

New York's permanent neglect statute provides natural parents with certain procedural protections.[2] But New York permits its officials to establish "permanent neglect" with less proof than most States require. Thirty-five States, the District of Columbia, and the Virgin Islands currently specify a higher standard of proof, in parental rights termination proceedings, than a "fair preponderance of the evidence."[3] The only analogous federal statute of which we are aware

---

[1] At oral argument, counsel for petitioners asserted that, in New York, natural parents have no means of restoring terminated parental rights. Tr. of Oral Arg. 9. Counsel for respondents, citing Fam. Ct. Act § 1061, answered that parents may petition the Family Court to vacate or set aside an earlier order on narrow grounds, such as newly discovered evidence or fraud. Tr. of Oral Arg. 26. Counsel for respondents conceded, however, that this statutory provision has never been invoked to set aside a permanent neglect finding. *Id.*, at 27.

[2] Most notably, natural parents have a statutory right to the assistance of counsel and of court-appointed counsel if they are indigent. Fam. Ct. Act § 262.(a)(iii).

[3] Fifteen States, by statute, have required "clear and convincing evidence" or its equivalent. See Alaska Stat. Ann. § 47.10.080(c)(3) (1980); Cal. Civ. Code Ann. § 232(a)(7) (West Supp. 1982); Ga. Code §§ 24A–2201(c), 24A–3201 (1979); Iowa Code § 600A.8 (1981) ("clear and convincing proof"); Me. Rev. Stat. Ann., Tit. 22, § 4055.1.B.(2) (Supp. 1981–1982); Mich. Comp. Laws § 722.25 (Supp. 1981–1982); Mo. Rev. Stat. § 211.447.2(2) (Supp. 1981) ("clear, cogent and convincing evidence"); N. M. Stat. Ann. § 40–7–4.J. (Supp. 1981); N. C. Gen. Stat. § 7A–289.30(e) (1981) ("clear, cogent, and convincing evidence"); Ohio Rev. Code Ann. §§ 2151.35, 2151.414(B) (Page Supp. 1982); R. I. Gen. Laws § 15–7–7(d) (Supp. 1980); Tenn. Code Ann. § 37–246(d) (Supp. 1981); Va. Code § 16.1–283.B (Supp. 1981); W. Va. Code § 49–6–2(c) (1980) ("clear and convincing proof"); Wis. Stat. § 48.31(1) (Supp. 1981–1982).

Fifteen States, the District of Columbia, and the Virgin Islands, by court decision, have required "clear and convincing evidence" or its equivalent. See *Dale County Dept. of Pensions & Security* v. *Robles*, 368 So. 2d 39, 42

permits termination of parental rights solely upon "evidence beyond a reasonable doubt." Indian Child Welfare Act of 1978, Pub. L. 95–608, § 102(f), 92 Stat. 3072, 25 U. S. C. § 1912(f) (1976 ed., Supp. IV). The question here is whether

(Ala. Civ. App. 1979); *Harper* v. *Caskin*, 265 Ark. 558, 560–561, 580 S. W. 2d 176, 178 (1979); *In re J. S. R.*, 374 A. 2d 860, 864 (D. C. 1977); *Torres* v. *Van Eepoel*, 98 So. 2d 735, 737 (Fla. 1957); *In re Kerns*, 225 Kan. 746, 753, 594 P. 2d 187, 193 (1979); *In re Rosenbloom*, 266 N. W. 2d 888, 889 (Minn. 1978) ("clear and convincing proof"); *In re J. L. B.*, 182 Mont. 100, 116–117, 594 P. 2d 1127, 1136 (1979); *In re Souza*, 204 Neb. 503, 510, 283 N. W. 2d 48, 52 (1979); *J.* v. *M.*, 157 N. J. Super. 478, 489, 385 A. 2d 240, 246 (App. Div. 1978); *In re J. A.*, 283 N. W. 2d 83, 92 (N. D. 1979); *In re Darren Todd H.*, 615 P. 2d 287, 289 (Okla. 1980); *In re William L.*, 477 Pa. 322, 332, 383 A. 2d 1228, 1233, cert. denied *sub nom. Lehman* v. *Lycoming County Children's Services*, 439 U. S. 880 (1978); *In re G. M.*, 596 S. W. 2d 846, 847 (Tex. 1980); *In re Pitts*, 535 P. 2d 1244, 1248 (Utah 1975); *In re Maria*, 15 V. I. 368, 384 (1978); *In re Sego*, 82 Wash. 2d 736, 739, 513 P. 2d 831, 833 (1973) ("clear, cogent, and convincing evidence"); *In re X.*, 607 P. 2d 911, 919 (Wyo. 1980) ("clear and unequivocal").

South Dakota's Supreme Court has required a "clear preponderance" of the evidence in a dependency proceeding. See *In re B. E.*, 287 N. W. 2d 91, 96 (1979). Two States, New Hampshire and Louisiana, have barred parental rights terminations unless the key allegations have been proved beyond a reasonable doubt. See *State* v. *Robert H.*, 118 N. H. 713, 716, 393 A. 2d 1387, 1389 (1978); La. Rev. Stat. Ann. § 13:1603.A (West Supp. 1982). Two States, Illinois and New York, have required clear and convincing evidence, but only in certain types of parental rights termination proceedings. See Ill. Rev. Stat., ch. 37, ¶¶ 705–9(2), (3) (1979), amended by Act of Sept. 11, 1981, 1982 Ill. Laws, P. A. 82–437 (generally requiring a preponderance of the evidence, but requiring clear and convincing evidence to terminate the rights of minor parents and mentally ill or mentally deficient parents); N. Y. Soc. Serv. Law §§ 384–b.3(g), 384–b.4(c), and 384–b.4(e) (Supp. 1981–1982) (requiring "clear and convincing proof" before parental rights may be terminated for reasons of mental illness and mental retardation or severe and repeated child abuse).

So far as we are aware, only two federal courts have addressed the issue. Each has held that allegations supporting parental rights termination must be proved by clear and convincing evidence. *Sims* v. *State Dept. of Public Welfare*, 438 F. Supp. 1179, 1194 (SD Tex. 1977), rev'd on other grounds *sub nom. Moore* v. *Sims*, 442 U. S. 415 (1979); *Alsager* v. *District Court of*

New York's "fair preponderance of the evidence" standard is constitutionally sufficient.

### B

Petitioners John Santosky II and Annie Santosky are the natural parents of Tina and John III.  In November 1973, after incidents reflecting parental neglect, respondent Kramer, Commissioner of the Ulster County Department of Social Services, initiated a neglect proceeding under Fam. Ct. Act § 1022 and removed Tina from her natural home.  About 10 months later, he removed John III and placed him with foster parents.  On the day John was taken, Annie Santosky gave birth to a third child, Jed.  When Jed was only three days old, respondent transferred him to a foster home on the ground that immediate removal was necessary to avoid imminent danger to his life or health.

In October 1978, respondent petitioned the Ulster County Family Court to terminate petitioners' parental rights in the three children.[4]  Petitioners challenged the constitutionality of the "fair preponderance of the evidence" standard specified in Fam. Ct. Act § 622.  The Family Court Judge rejected this constitutional challenge, App. 29–30, and weighed the evidence under the statutory standard.  While acknowledging that the Santoskys had maintained contact with their children, the judge found those visits "at best superficial and devoid of any real emotional content."  *Id.*, at 21.  After

---

*Polk County*, 406 F. Supp. 10, 25 (SD Iowa 1975), aff'd on other grounds, 545 F. 2d 1137 (CA8 1976).

[4] Respondent had made an earlier and unsuccessful termination effort in September 1976.  After a factfinding hearing, the Family Court Judge dismissed respondent's petition for failure to prove an essential element of Fam. Ct. Act § 614.1.(d).  See *In re Santosky*, 89 Misc. 2d 730, 393 N. Y. S. 2d 486 (1977).  The New York Supreme Court, Appellate Division, affirmed, finding that "the record as a whole" revealed that petitioners had "substantially planned for the future of the children." *In re John W.*, 63 App. Div. 2d 750, 751, 404 N. Y. S. 2d 717, 719 (1978).

deciding that the agency had made "'diligent efforts' to encourage and strengthen the parental relationship," *id.*, at 30, he concluded that the Santoskys were incapable, even with public assistance, of planning for the future of their children. *Id.*, at 33–37. The judge later held a dispositional hearing and ruled that the best interests of the three children required permanent termination of the Santoskys' custody.[5] *Id.*, at 39.

Petitioners appealed, again contesting the constitutionality of § 622's standard of proof.[6] The New York Supreme Court, Appellate Division, affirmed, holding application of the preponderance-of-the-evidence standard "proper and constitutional." *In re John AA*, 75 App. Div. 2d 910, 427 N. Y. S. 2d 319, 320 (1980). That standard, the court reasoned, "recognizes and seeks to balance rights possessed by the child . . . with those of the natural parents . . . ." *Ibid.*

The New York Court of Appeals then dismissed petitioners' appeal to that court "upon the ground that no substantial constitutional question is directly involved." App. 55. We granted certiorari to consider petitioners' constitutional claim. 450 U. S. 993 (1981).

## II

Last Term, in *Lassiter* v. *Department of Social Services*, 452 U. S. 18 (1981), this Court, by a 5–4 vote, held that the

---

[5] Since respondent Kramer took custody of Tina, John III, and Jed, the Santoskys have had two other children, James and Jeremy. The State has taken no action to remove these younger children. At oral argument, counsel for respondents replied affirmatively when asked whether he was asserting that petitioners were "unfit to handle the three older ones but not unfit to handle the two younger ones." Tr. of Oral Arg. 24.

[6] Petitioners initially had sought review in the New York Court of Appeals. That court *sua sponte* transferred the appeal to the Appellate Division, Third Department, stating that a direct appeal did not lie because "questions other than the constitutional validity of a statutory provision are involved." App. 50.

Fourteenth Amendment's Due Process Clause does not require the appointment of counsel for indigent parents in every parental status termination proceeding. The case casts light, however, on the two central questions here—whether process is constitutionally due a natural parent at a State's parental rights termination proceeding, and, if so, what process is due.

In *Lassiter*, it was "not disputed that state intervention to terminate the relationship between [a parent] and [the] child must be accomplished by procedures meeting the requisites of the Due Process Clause." *Id.*, at 37 (first dissenting opinion); see *id.*, at 24–32 (opinion of the Court); *id.*, at 59–60 (STEVENS, J., dissenting). See also *Little* v. *Streater*, 452 U. S. 1, 13 (1981). The absence of dispute reflected this Court's historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment. *Quilloin* v. *Walcott*, 434 U. S. 246, 255 (1978); *Smith* v. *Organization of Foster Families*, 431 U. S. 816, 845 (1977); *Moore* v. *East Cleveland*, 431 U. S. 494, 499 (1977) (plurality opinion); *Cleveland Board of Education* v. *LaFleur*, 414 U. S. 632, 639–640 (1974); *Stanley* v. *Illinois*, 405 U. S. 645, 651–652 (1972); *Prince* v. *Massachusetts*, 321 U. S. 158, 166 (1944); *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–535 (1925); *Meyer* v. *Nebraska*, 262 U. S. 390, 399 (1923).

The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to

destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.[7]

In *Lassiter*, the Court and three dissenters agreed that the nature of the process due in parental rights termination proceedings turns on a balancing of the "three distinct factors" specified in *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976): the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure. See 452 U. S., at 27–31; *id.*, at 37–48 (first dissenting opinion). But see *id.*, at 59–60 (STEVENS, J., dissenting). While the respective *Lassiter* opinions disputed whether those factors should be weighed against a presumption disfavoring appointed counsel for one not threatened with loss of physical liberty, compare 452 U. S., at 31–32, with *id.*, at 41, and n. 8 (first dissenting opinion), that concern is irrelevant here. Unlike the Court's right-to-counsel rulings, its decisions concerning constitutional burdens of proof have not turned on any presumption favoring any particular standard. To the contrary, the Court has engaged in a straightforward consideration of the factors identified in *Eldridge* to determine whether a particular standard of proof in a particular proceeding satisfies due process.

In *Addington* v. *Texas*, 441 U. S. 418 (1979), the Court, by a unanimous vote of the participating Justices, declared: "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to

---

[7] We therefore reject respondent Kramer's claim that a parental rights termination proceeding does not interfere with a fundamental liberty interest. See Brief for Respondent Kramer 11–18; Tr. of Oral Arg. 38. The fact that important liberty interests of the child and its foster parents may also be affected by a permanent neglect proceeding does not justify denying the *natural parents* constitutionally adequate procedures. Nor can the State refuse to provide natural parents adequate procedural safeguards on the ground that the family unit already has broken down; that is the very issue the permanent neglect proceeding is meant to decide.

'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" *Id.*, at 423, quoting *In re Winship*, 397 U. S. 358, 370 (1970) (Harlan, J., concurring). *Addington* teaches that, in any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants.

Thus, while private parties may be interested intensely in a civil dispute over money damages, application of a "fair preponderance of the evidence" standard indicates both society's "minimal concern with the outcome," and a conclusion that the litigants should "share the risk of error in roughly equal fashion." 441 U. S., at 423. When the State brings a criminal action to deny a defendant liberty or life, however, "the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment." *Ibid.* The stringency of the "beyond a reasonable doubt" standard bespeaks the "weight and gravity" of the private interest affected, *id.*, at 427, society's interest in avoiding erroneous convictions, and a judgment that those interests together require that "society impos[e] almost the entire risk of error upon itself." *Id.*, at 424. See also *In re Winship*, 397 U. S., at 372 (Harlan, J., concurring).

The "minimum requirements [of procedural due process] being a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action." *Vitek* v. *Jones*, 445 U. S. 480, 491 (1980). See also *Logan* v. *Zimmerman Brush Co.*, *ante*, at 432. Moreover, the degree of proof required in a particular type of proceeding "is the kind of question which has

traditionally been left to the judiciary to resolve." *Woodby* v. *INS*, 385 U. S. 276, 284 (1966).[8] "In cases involving individual rights, whether criminal or civil, '[t]he standard of proof [at a minimum] reflects the value society places on individual liberty.'" *Addington* v. *Texas*, 441 U. S., at 425, quoting *Tippett* v. *Maryland*, 436 F. 2d 1153, 1166 (CA4 1971) (opinion concurring in part and dissenting in part), cert. dism'd *sub nom. Murel* v. *Baltimore City Criminal Court*, 407 U. S. 355 (1972).

This Court has mandated an intermediate standard of proof—"clear and convincing evidence"—when the individual interests at stake in a state proceeding are both "particularly important" and "more substantial than mere loss of money." *Addington* v. *Texas*, 441 U. S., at 424. Notwithstanding "the state's 'civil labels and good intentions,'" *id.*, at 427, quoting *In re Winship*, 397 U. S., at 365–366, the Court has deemed this level of certainty necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with "a significant deprivation of liberty" or "stigma." 441 U. S., at 425, 426. See, *e. g.*, *Addington* v. *Texas*, *supra* (civil commitment); *Woodby* v. *INS*, 385 U. S., at 285 (deportation); *Chaunt* v. *United States*, 364 U. S. 350, 353 (1960) (denaturalization);

---

[8] The dissent charges, *post*, at 772, n. 2, that "this Court simply has no role in establishing the standards of proof that States must follow in the various judicial proceedings they afford to their citizens." As the dissent properly concedes, however, the Court must examine a State's chosen standard to determine whether it satisfies "the constitutional minimum of 'fundamental fairness.'" *Ibid.* See, *e. g.*, *Addington* v. *Texas*, 441 U. S. 418, 427, 433 (1979) (unanimous decision of participating Justices) (Fourteenth Amendment requires at least clear and convincing evidence in a civil proceeding brought under state law to commit an individual involuntarily for an indefinite period to a state mental hospital); *In re Winship*, 397 U. S. 358, 364 (1970) (Due Process Clause of the Fourteenth Amendment protects the accused in state proceeding against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged).

*Schneiderman* v. *United States*, 320 U. S. 118, 125, 159 (1943) (denaturalization).

In *Lassiter*, to be sure, the Court held that fundamental fairness may be maintained in parental rights termination proceedings even when some procedures are mandated only on a case-by-case basis, rather than through rules of general application. 452 U. S., at 31–32 (natural parent's right to court-appointed counsel should be determined by the trial court, subject to appellate review). But this Court never has approved case-by-case determination of the proper *standard of proof* for a given proceeding. Standards of proof, like other "procedural due process rules[,] are shaped by the risk of error inherent in the truth-finding process as applied to the *generality of cases*, not the rare exceptions." *Mathews* v. *Eldridge*, 424 U. S., at 344 (emphasis added). Since the litigants and the factfinder must know at the outset of a given proceeding how the risk of error will be allocated, the standard of proof necessarily must be calibrated in advance. Retrospective case-by-case review cannot preserve fundamental fairness when a class of proceedings is governed by a constitutionally defective evidentiary standard.[9]

---

[9] For this reason, we reject the suggestions of respondents and the dissent that the constitutionality of New York's statutory procedures must be evaluated as a "package." See Tr. of Oral Arg. 25, 36, 38. Indeed, we would rewrite our precedents were we to excuse a constitutionally defective standard of proof based on an amorphous assessment of the "cumulative effect" of state procedures. In the criminal context, for example, the Court has never assumed that "strict substantive standards or special procedures compensate for a lower burden of proof . . . ." *Post*, at 773. See *In re Winship*, 397 U. S., at 368. Nor has the Court treated appellate review as a curative for an inadequate burden of proof. See *Woodby* v. *INS*, 385 U. S. 276, 282 (1966) ("judicial review is generally limited to ascertaining whether the evidence relied upon by the trier of fact was of sufficient quality and substantiality to support the rationality of the judgment").

As the dissent points out, "the standard of proof is a crucial component of legal process, the primary function of which is 'to minimize the risk of erro-

## III

In parental rights termination proceedings, the private interest affected is commanding; the risk of error from using a preponderance standard is substantial; and the countervailing governmental interest favoring that standard is comparatively slight. Evaluation of the three *Eldridge* factors compels the conclusion that use of a "fair preponderance of the evidence" standard in such proceedings is inconsistent with due process.

## A

"The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss.'" *Goldberg* v. *Kelly*, 397 U. S. 254, 262–263 (1970), quoting *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring). Whether the loss threatened by a particular type of proceeding is sufficiently grave to warrant more than average certainty on the part of the factfinder turns on both the nature of the private interest threatened and the permanency of the threatened loss.

*Lassiter* declared it "plain beyond the need for multiple citation" that a natural parent's "desire for and right to 'the companionship, care, custody, and management of his or her children'" is an interest far more precious than any property

---

neous decisions.'" *Post,* at 785, quoting *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S. 1, 13 (1979). Notice, summons, right to counsel, rules of evidence, and evidentiary hearings are all procedures to place information *before* the factfinder. But only the standard of proof "instruct[s] the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions" he draws from that information. *In re Winship,* 397 U. S., at 370 (Harlan, J., concurring). The statutory provision of right to counsel and multiple hearings before termination cannot suffice to protect a natural parent's fundamental liberty interests if the State is willing to tolerate undue uncertainty in the determination of the dispositive facts.

right. 452 U. S., at 27, quoting *Stanley* v. *Illinois*, 405 U. S., at 651. When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it. "If the State prevails, it will have worked a unique kind of deprivation. . . . A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." 452 U. S., at 27.

In government-initiated proceedings to determine juvenile delinquency, *In re Winship, supra;* civil commitment, *Addington* v. *Texas, supra;* deportation, *Woodby* v. *INS, supra;* and denaturalization, *Chaunt* v. *United States, supra,* and *Schneiderman* v. *United States, supra,* this Court has identified losses of individual liberty sufficiently serious to warrant imposition of an elevated burden of proof. Yet juvenile delinquency adjudications, civil commitment, deportation, and denaturalization, at least to a degree, are all *reversible* official actions. Once affirmed on appeal, a New York decision terminating parental rights is *final* and irrevocable. See n. 1, *supra.* Few forms of state action are both so severe and so irreversible.

Thus, the first *Eldridge* factor—the private interest affected—weighs heavily against use of the preponderance standard at a state-initiated permanent neglect proceeding. We do not deny that the child and his foster parents are also deeply interested in the outcome of that contest. But at the factfinding stage of the New York proceeding, the focus emphatically is not on them.

The factfinding does not purport—and is not intended—to balance the child's interest in a normal family home against the parents' interest in raising the child. Nor does it purport to determine whether the natural parents or the foster parents would provide the better home. Rather, the factfinding hearing pits the State directly against the parents. The State alleges that the natural parents are at fault. Fam. Ct. Act § 614.1.(d). The questions disputed and decided are

what the State did—"made diligent efforts," § 614.1.(c)—and what the natural parents did not do—"maintain contact with or plan for the future of the child." § 614.1.(d). The State marshals an array of public resources to prove its case and disprove the parents' case. Victory by the State not only makes termination of parental rights possible; it entails a judicial determination that the parents are unfit to raise their own children.[10]

At the factfinding, the State cannot presume that a child and his parents are adversaries. After the State has established parental unfitness at that initial proceeding, the court may assume at the *dispositional* stage that the interests of the child and the natural parents do diverge. See Fam. Ct. Act § 631 (judge shall make his order "solely on the basis of the best interests of the child," and thus has no obligation to consider the natural parents' rights in selecting dispositional alternatives). But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.[11] Thus,

---

[10] The Family Court Judge in the present case expressly refused to terminate petitioners' parental rights on a "non-statutory, no-fault basis." App. 22–29. Nor is it clear that the State constitutionally could terminate a parent's rights *without* showing parental unfitness. See *Quilloin* v. *Walcott*, 434 U. S. 246, 255 (1978) ("We have little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the .parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest,'" quoting *Smith* v. *Organization of Foster Families*, 431 U. S. 816, 862–863 (1977) (Stewart, J., concurring in judgment)).

[11] For a child, the consequences of termination of his natural parents' rights may well be far-reaching. In Colorado, for example, it has been noted: "The child loses the right of support and maintenance, for which he may thereafter be dependent upon society; the right to inherit; and all other rights inherent in the legal parent-child relationship, not just for [a limited] period . . . , but forever." *In re K. S.*, 33 Colo. App. 72, 76, 515 P. 2d 130, 133 (1973).

Some losses cannot be measured. In this case, for example, Jed Santosky was removed from his natural parents' custody when he was only

at the factfinding, the interests of the child and his natural parents coincide to favor use of error-reducing procedures.

However substantial the foster parents' interests may be, cf. *Smith* v. *Organization of Foster Families*, 431 U. S., at 845–847, they are not implicated directly in the factfinding stage of a state-initiated permanent neglect proceeding against the natural parents. If authorized, the foster parents may pit their interests directly against those of the natural parents by initiating their own permanent neglect proceeding. Fam. Ct. Act § 1055(d); Soc. Serv. Law §§ 384–6.3(b), 392.7.(c). Alternatively, the foster parents can make their case for custody at the dispositional stage of a state-initiated proceeding, where the judge already has decided the issue of permanent neglect and is focusing on the placement that would serve the child's best interests. Fam. Ct. Act §§ 623, 631. For the foster parents, the State's failure to prove permanent neglect may prolong the delay and uncertainty until their foster child is freed for adoption. But for the natural parents, a finding of permanent neglect can cut off forever their rights in their child. Given this disparity of consequence, we have no difficulty finding that the balance of private interests strongly favors heightened procedural protections.

B

Under *Mathews* v. *Eldridge*, we next must consider both the risk of erroneous deprivation of private interests resulting from use of a "fair preponderance" standard and the likelihood that a higher evidentiary standard would reduce that risk. See 424 U. S., at 335. Since the factfinding phase of a permanent neglect proceeding is an adversary contest between the State and the natural parents, the relevant question is whether a preponderance standard fairly allocates the risk of an erroneous factfinding between these two parties.

---

three days old; the judge's finding of permanent neglect effectively foreclosed the possibility that Jed would ever know his natural parents.

In New York, the factfinding stage of a state-initiated permanent neglect proceeding bears many of the indicia of a criminal trial. Cf. *Lassiter* v. *Department of Social Services*, 452 U. S., at 42–44 (first dissenting opinion); *Meltzer* v. *C. Buck LeCraw & Co.*, 402 U. S. 954, 959 (1971) (Black, J., dissenting from denial of certiorari). See also dissenting opinion, *post*, at 777–779 (describing procedures employed at factfinding proceeding). The Commissioner of Social Services charges the parents with permanent neglect. They are served by summons. Fam. Ct. Act §§ 614, 616, 617. The factfinding hearing is conducted pursuant to formal rules of evidence. § 624. The State, the parents, and the child are all represented by counsel. §§ 249, 262. The State seeks to establish a series of historical facts about the intensity of its agency's efforts to reunite the family, the infrequency and insubstantiality of the parents' contacts with their child, and the parents' inability or unwillingness to formulate a plan for the child's future. The attorneys submit documentary evidence, and call witnesses who are subject to cross-examination. Based on all the evidence, the judge then determines whether the State has proved the statutory elements of permanent neglect by a fair preponderance of the evidence. § 622.

At such a proceeding, numerous factors combine to magnify the risk of erroneous factfinding. Permanent neglect proceedings employ imprecise substantive standards that leave determinations unusually open to the subjective values of the judge. See *Smith* v. *Organization of Foster Families*, 431 U. S., at 835, n. 36. In appraising the nature and quality of a complex series of encounters among the agency, the parents, and the child, the court possesses unusual discretion to underweigh probative facts that might favor the parent.[12]

---

[12] For example, a New York court appraising an agency's "diligent efforts" to provide the parents with social services can excuse efforts *not* made on the grounds that they would have been "detrimental to the best interests of the child." Fam. Ct. Act § 614.1.(c). In determining whether

Because parents subject to termination proceedings are often poor, uneducated, or members of minority groups, *id.*, at 833–835, such proceedings are often vulnerable to judgments based on cultural or class bias.

The State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense. No predetermined limits restrict the sums an agency may spend in prosecuting a given termination proceeding. The State's attorney usually will be expert on the issues contested and the procedures employed at the factfinding hearing, and enjoys full access to all public records concerning the family. The State may call on experts in family relations, psychology, and medicine to bolster its case. Furthermore, the primary witnesses at the hearing will be the agency's own professional caseworkers whom the State has empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination.[13]

---

the parent "substantially and continuously or repeatedly" failed to "maintain contact with . . . the child," § 614.1.(d), the judge can discount actual visits or communications on the grounds that they were insubstantial or "overtly demonstrat[ed] a lack of affectionate and concerned parenthood." Soc. Serv. Law § 384–b.7.(b). When determining whether the parent planned for the child's future, the judge can reject as unrealistic plans based on overly optimistic estimates of physical or financial ability. § 384–b.7.(c). See also dissenting opinion, *post*, at 779–780, nn. 8 and 9.

[13] In this case, for example, the parents claim that the State sought court orders denying them the right to visit their children, which would have prevented them from maintaining the contact required by Fam. Ct. Act. § 614.1.(d). See Brief for Petitioners 9. The parents further claim that the State cited their rejection of social services they found offensive or superfluous as proof of the agency's "diligent efforts" and their own "failure to plan" for the children's future. *Id.*, at 10–11.

We need not accept these statements as true to recognize that the State's unusual ability to structure the evidence increases the risk of an erroneous factfinding. Of course, the disparity between the litigants' re-

The disparity between the adversaries' litigation resources is matched by a striking asymmetry in their litigation options. Unlike criminal defendants, natural parents have no "double jeopardy" defense against repeated state termination efforts. If the State initially fails to win termination, as New York did here, see n. 4, *supra*, it always can try once again to cut off the parents' rights after gathering more or better evidence. Yet even when the parents have attained the level of fitness required by the State, they have no similar means by which they can forestall future termination efforts.

Coupled with a "fair preponderance of the evidence" standard, these factors create a significant prospect of erroneous termination. A standard of proof that by its very terms demands consideration of the quantity, rather than the quality, of the evidence may misdirect the factfinder in the marginal case. See *In re Winship*, 397 U. S., at 371, n. 3 (Harlan, J., concurring). Given the weight of the private interests at stake, the social cost of even occasional error is sizable.

Raising the standard of proof would have both practical and symbolic consequences. Cf. *Addington* v. *Texas*, 441 U. S., at 426. The Court has long considered the heightened standard of proof used in criminal prosecutions to be "a prime instrument for reducing the risk of convictions resting on factual error." *In re Winship*, 397 U. S., at 363. An elevated standard of proof in a parental rights termination proceeding would alleviate "the possible risk that a factfinder might decide to [deprive] an individual based solely on a few isolated instances of unusual conduct [or] . . . idiosyncratic behavior." *Addington* v. *Texas*, 441 U. S., at 427. "Increasing the burden of proof is one way to impress the factfinder with the im-

---

sources will be vastly greater in States where there is no statutory right to court-appointed counsel. See *Lassiter* v. *Department of Social Services*, 452 U. S. 18, 34 (1981) (only 33 States and the District of Columbia provide that right by statute).

portance of the decision and thereby perhaps to reduce the chances that inappropriate" terminations will be ordered. *Ibid.*

The Appellate Division approved New York's preponderance standard on the ground that it properly "balanced rights possessed by the child . . . with those of the natural parents. . . ." 75 App. Div. 2d, at 910, 427 N. Y. S. 2d, at 320. By so saying, the court suggested that a preponderance standard properly allocates the risk of error *between* the parents and the child.[14] That view is fundamentally mistaken.

The court's theory assumes that termination of the natural parents' rights invariably will benefit the child.[15] Yet we have noted above that the parents and the child share an interest in avoiding erroneous termination. Even accepting the court's assumption, we cannot agree with its conclusion that a preponderance standard fairly distributes the risk of error between parent and child. Use of that standard reflects the judgment that society is nearly neutral between erroneous termination of parental rights and erroneous failure to terminate those rights. Cf. *In re Winship*, 397 U. S., at 371 (Harlan, J., concurring). For the child, the likely consequence of an erroneous failure to terminate is preservation of

---

[14] The dissent makes a similar claim. See *post*, at 786–791.

[15] This is a hazardous assumption at best. Even when a child's natural home is imperfect, permanent removal from that home will not necessarily improve his welfare. See, *e. g.*, Wald, State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards, 27 Stan. L. Rev. 985, 993 (1975) ("In fact, under current practice, coercive intervention frequently results in placing a child in a more detrimental situation than he would be in without intervention").

Nor does termination of parental rights necessarily ensure adoption. See Brief for Community Action for Legal Services, Inc., et al. as *Amici Curiae* 22–23. Even when a child eventually finds an adoptive family, he may spend years moving between state institutions and "temporary" foster placements after his ties to his natural parents have been severed. See *Smith* v. *Organization of Foster Families*, 431 U. S., at 833–838 (describing the "limbo" of the New York foster care system).

an uneasy status quo.[16] For the natural parents, however, the consequence of an erroneous termination is the unnecessary destruction of their natural family. A standard that allocates the risk of error nearly equally between those two outcomes does not reflect properly their relative severity.

## C

Two state interests are at stake in parental rights termination proceedings—a *parens patriae* interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings. A standard of proof more strict than preponderance of the evidence is consistent with both interests.

"Since the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision" at the *factfinding* proceeding. *Lassiter* v. *Department of Social Services*, 452 U. S., at 27. As *parens patriae*, the State's goal is to provide the child with a permanent home. See Soc. Serv. Law § 384–b.1.(a)(i) (statement of legislative findings and intent). Yet while there is still reason to believe that positive, nurturing parent-child relationships exist, the *parens patriae* interest favors preservation, not

---

[16] When the termination proceeding occurs, the child is not living at his natural home. A child cannot be adjudicated "permanently neglected" until, "for a period of more than one year," he has been in "the care of an authorized agency." Soc. Serv. Law § 384–b.7.(a); Fam. Ct. Act § 614.1.(d). See also dissenting opinion, *post*, at 789–790.

Under New York law, a judge has ample discretion to ensure that, once removed from his natural parents on grounds of neglect, a child will not return to a hostile environment. In this case, when the State's initial termination effort failed for lack of proof, see n. 4, *supra*, the court simply issued orders under Fam. Ct. Act § 1055(b) extending the period of the child's foster home placement. See App. 19–20. See also Fam. Ct. Act § 632(b) (when State's permanent neglect petition is dismissed for insufficient evidence, judge retains jurisdiction to reconsider underlying orders of placement); § 633 (judge may suspend judgment at dispositional hearing for an additional year).

severance, of natural familial bonds.[17]  § 384–b.1.(a)(ii). "[T]he State registers no gain towards its declared goals when it separates children from the custody of fit parents." *Stanley* v. *Illinois*, 405 U. S., at 652.

The State's interest in finding the child an alternative permanent home arises only "when it is *clear* that the natural parent cannot or will not provide a normal family home for the child."  Soc. Serv. Law § 384–b.1.(a)(iv) (emphasis added).  At the factfinding, that goal is served by procedures that promote an accurate determination of whether the natural parents can and will provide a normal home.

Unlike a constitutional requirement of hearings, see, *e. g.*, *Mathews* v. *Eldridge*, 424 U. S., at 347, or court-appointed counsel, a stricter standard of proof would reduce factual error without imposing substantial fiscal burdens upon the State.  As we have observed, 35 States already have adopted a higher standard by statute or court decision without apparent effect on the speed, form, or cost of their factfinding proceedings.  See n. 3, *supra*.

Nor would an elevated standard of proof create any real administrative burdens for the State's factfinders.  New York Family Court judges already are familiar with a higher evidentiary standard in other parental rights termination proceedings not involving permanent neglect.  See Soc. Serv. Law §§ 384–b.3.(g), 384–b.4.(c), and 384–b.4.(e) (requiring "clear and convincing proof" before parental rights may be terminated for reasons of mental illness and mental retardation or severe and repeated child abuse).  New York also demands at least clear and convincing evidence in proceedings of far less moment than parental rights termination proceedings.  See, *e. g.*, N. Y. Veh. & Traf. Law § 227.1 (McKinney Supp. 1981) (requiring the State to prove traffic

---

[17] Any *parens patriae* interest in terminating the natural parents' rights arises only at the dispositional phase, *after* the parents have been found unfit.

infractions by "clear and convincing evidence") and *In re Rosenthal* v. *Hartnett*, 36 N. Y. 2d 269, 326 N. E. 2d 811 (1975); see also *Ross* v. *Food Specialties, Inc.*, 6 N. Y. 2d 336, 341, 160 N. E. 2d 618, 620 (1959) (requiring "clear, positive and convincing evidence" for contract reformation). We cannot believe that it would burden the State unduly to require that its factfinders have the same factual certainty when terminating the parent-child relationship as they must have to suspend a driver's license.

## IV

The logical conclusion of this balancing process is that the "fair preponderance of the evidence" standard prescribed by Fam. Ct. Act § 622 violates the Due Process Clause of the Fourteenth Amendment.[18]   The Court noted in *Addington:* "The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state."   441 U. S., at 427.   Thus, at a parental rights termination proceeding, a near-equal allocation of risk between the parents and the State is constitutionally intolerable.   The next question, then, is whether a "beyond a reasonable doubt" or a "clear and convincing" standard is constitutionally mandated.

In *Addington*, the Court concluded that application of a reasonable-doubt standard is inappropriate in civil commitment proceedings for two reasons—because of our hesitation to apply that unique standard "too broadly or casually in noncriminal cases," *id.*, at 428, and because the psychiatric evidence ordinarily adduced at commitment proceedings is

---

[18] The dissent's claim that today's decision "will inevitably lead to the federalization of family law," *post*, at 773, is, of course, vastly overstated.   As the dissent properly notes, the Court's duty to "refrai[n] from interfering with state answers to domestic relations questions" has never required "that the Court should blink at clear constitutional violations in state statutes."   *Post*, at 771.

rarely susceptible to proof beyond a reasonable doubt. *Id.*, at 429–430, 432–433. To be sure, as has been noted above, in the Indian Child Welfare Act of 1978, Pub. L. 95–608, § 102(f), 92 Stat. 3072, 25 U. S. C. § 1912(f) (1976 ed., Supp. IV), Congress requires "evidence beyond a reasonable doubt" for termination of Indian parental rights, reasoning that "the removal of a child from the parents is a penalty as great [as], if not greater, than a criminal penalty . . . ." H. R. Rep. No. 95–1386, p. 22 (1978). Congress did not consider, however, the evidentiary problems that would arise if proof beyond a reasonable doubt were required in all state-initiated parental rights termination hearings.

Like civil commitment hearings, termination proceedings often require the factfinder to evaluate medical and psychiatric testimony, and to decide issues difficult to prove to a level of absolute certainty, such as lack of parental motive, absence of affection between parent and child, and failure of parental foresight and progress. Cf. *Lassiter* v. *Department of Social Services*, 452 U. S., at 30; *id.*, at 44–46 (first dissenting opinion) (describing issues raised in state termination proceedings). The substantive standards applied vary from State to State. Although Congress found a "beyond a reasonable doubt" standard proper in one type of parental rights termination case, another legislative body might well conclude that a reasonable-doubt standard would erect an unreasonable barrier to state efforts to free permanently neglected children for adoption.

A majority of the States have concluded that a "clear and convincing evidence" standard of proof strikes a fair balance between the rights of the natural parents and the State's legitimate concerns. See n. 3, *supra.* We hold that such a standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process. We further hold that determination of the precise burden equal to or greater than that standard

is a matter of state law properly left to state legislatures and state courts. Cf. *Addington* v. *Texas*, 441 U. S., at 433.

We, of course, express no view on the merits of petitioners' claims.[19] At a hearing conducted under a constitutionally proper standard, they may or may not prevail. Without deciding the outcome under any of the standards we have approved, we vacate the judgment of the Appellate Division and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE O'CONNOR join, dissenting.

I believe that few of us would care to live in a society where every aspect of life was regulated by a single source of law, whether that source be this Court or some other organ of our complex body politic. But today's decision certainly moves us in that direction. By parsing the New York scheme and holding one narrow provision unconstitutional, the majority invites further federal-court intrusion into every facet of state family law. If ever there were an area in which federal courts should heed the admonition of Justice Holmes that "a page of history is worth a volume of logic,"[1] it is in the area of domestic relations. This area has been left to the States from time immemorial, and not without good reason.

Equally as troubling is the majority's due process analysis. The Fourteenth Amendment guarantees that a State will treat individuals with "fundamental fairness" whenever its actions infringe their protected liberty or property interests. By adoption of the procedures relevant to this case, New

---

[19] Unlike the dissent, we carefully refrain from accepting as the "facts of this case" findings that are not part of the record and that have been found only to be more likely true than not.

[1] *New York Trust Co.* v. *Eisner*, 256 U. S. 345, 349 (1921).

York has created an exhaustive program to assist parents in regaining the custody of their children and to protect parents from the unfair deprivation of their parental rights. And yet the majority's myopic scrutiny of the standard of proof blinds it to the very considerations and procedures which make the New York scheme "fundamentally fair."

I

State intervention in domestic relations has always been an unhappy but necessary feature of life in our organized society. For all of our experience in this area, we have found no fully satisfactory solutions to the painful problem of child abuse and neglect. We have found, however, that leaving the States free to experiment with various remedies has produced novel approaches and promising progress.

Throughout this experience the Court has scrupulously refrained from interfering with state answers to domestic relations questions. "Both theory and the precedents of this Court teach us solicitude for state interests, particularly in the field of family and family-property arrangements." *United States* v. *Yazell*, 382 U. S. 341, 352 (1966). This is not to say that the Court should blink at clear constitutional violations in state statutes, but rather that in this area, of all areas, "substantial weight must be given to the good-faith judgments of the individuals [administering a program] . . . that the procedures they have provided assure fair consideration of the . . . claims of individuals." *Mathews* v. *Eldridge*, 424 U. S. 319, 349 (1976).

This case presents a classic occasion for such solicitude. As will be seen more fully in the next part, New York has enacted a comprehensive plan to *aid* marginal parents in regaining the custody of their child. The central purpose of the New York plan is to reunite divided families. Adoption of the preponderance-of-the-evidence standard represents New York's good-faith effort to balance the interest of par-

ents against the legitimate interests of the child and the State. These earnest efforts by state officials should be given weight in the Court's application of due process principles. "Great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." *Missouri, K. & T. R. Co.* v. *May,* 194 U. S. 267, 270 (1904).[2]

The majority may believe that it is adopting a relatively unobtrusive means of ensuring that termination proceedings provide "due process of law." In fact, however, fixing the standard of proof as a matter of federal constitutional law will only lead to further federal-court intervention in state schemes. By holding that due process requires proof by clear and convincing evidence the majority surely cannot mean that any state scheme passes constitutional muster so long as it applies that standard of proof. A state law permitting termination of parental rights upon a showing of neglect by clear and convincing evidence certainly would not be ac-

---

[2] The majority asserts that "the degree of proof required in a particular type of proceeding 'is the kind of question which has traditionally been left to the judiciary to resolve.' *Woodby* v. *INS,* 385 U. S. 276, 284 (1966)." *Ante,* at 755–756. To the extent that the majority seeks, by this statement, to place upon the federal judiciary the primary responsibility for deciding the appropriate standard of proof in state matters, it arrogates to itself a responsibility wholly at odds with the allocation of authority in our federalist system and wholly unsupported by the prior decisions of this Court. In *Woodby* v. *INS,* 385 U. S. 276 (1966), the Court determined the proper standard of proof to be applied under a *federal* statute, and did so only after concluding that "Congress ha[d] not addressed itself to the question of what *degree of proof* [was] required in deportation proceedings." *Id.,* at 284. Beyond an examination for the constitutional minimum of "fundamental fairness"—which clearly is satisfied by the New York procedures at issue in this case—this Court simply has no role in establishing the standards of proof that States must follow in the various judicial proceedings they afford to their citizens.

ceptable to the majority if it provided no procedures other than one 30-minute hearing. Similarly, the majority probably would balk at a state scheme that permitted termination of parental rights on a clear and convincing showing merely that such action would be in the best interests of the child. See *Smith* v. *Organization of Foster Families*, 431 U. S. 816, 862–863 (1977) (Stewart, J., concurring in judgment).

After fixing the standard of proof, therefore, the majority will be forced to evaluate other aspects of termination proceedings with reference to that point. Having in this case abandoned evaluation of the overall effect of a scheme, and with it the possibility of finding that strict substantive standards or special procedures compensate for a lower burden of proof, the majority's approach will inevitably lead to the federalization of family law. Such a trend will only thwart state searches for better solutions in an area where this Court should encourage state experimentation. "It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country. This Court has the power to prevent an experiment." *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting). It should not do so in the absence of a clear constitutional violation. As will be seen in the next part, no clear constitutional violation has occurred in this case.

## II

As the majority opinion notes, petitioners are the parents of five children, three of whom were removed from petitioners' care on or before August 22, 1974. During the next four and one-half years, those three children were in the custody of the State and in the care of foster homes or institutions, and the State was diligently engaged in efforts to prepare petitioners for the children's return. Those efforts were un-

successful, however, and on April 10, 1979, the New York Family Court for Ulster County terminated petitioners' parental rights as to the three children removed in 1974 or earlier. This termination was preceded by a judicial finding that petitioners had failed to plan for the return and future of their children, a statutory category of permanent neglect. Petitioners now contend, and the Court today holds, that they were denied due process of law, not because of a general inadequacy of procedural protections, but simply because the finding of permanent neglect was made on the basis of a preponderance of the evidence adduced at the termination hearing.

It is well settled that "[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents* v. *Roth*, 408 U. S. 564, 569 (1972). In determining whether such liberty or property interests are implicated by a particular government action, "we must look not to the 'weight' but to the *nature* of the interest at stake." *Id.*, at 571 (emphasis in original). I do not disagree with the majority's conclusion that the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment. See *Smith* v. *Organization of Foster Families*, *supra*, at 862–863 (Stewart, J., concurring in judgment). "Once it is determined that due process applies, [however,] the question remains what process is due." *Morrissey* v. *Brewer*, 408 U. S. 471, 481 (1972). It is the majority's answer to this question with which I disagree.

A

Due process of law is a flexible constitutional principle. The requirements which it imposes upon governmental actions vary with the situations to which it applies. As the Court previously has recognized, "not all situations calling for

procedural safeguards call for the same kind of procedure." *Morrissey* v. *Brewer, supra,* at 481. See also *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S. 1, 12 (1979); *Mathews* v. *Eldridge,* 424 U. S., at 334; *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 895 (1961). The adequacy of a scheme of procedural protections cannot, therefore, be determined merely by the application of general principles unrelated to the peculiarities of the case at hand.

Given this flexibility, it is obvious that a proper due process inquiry cannot be made by focusing upon one narrow provision of the challenged statutory scheme. Such a focus threatens to overlook factors which may introduce constitutionally adequate protections into a particular government action. Courts must examine *all* procedural protections offered by the State, and must assess the *cumulative* effect of such safeguards. As we have stated before, courts must consider "the fairness and reliability of the existing . . . procedures" before holding that the Constitution requires more. *Mathews* v. *Eldridge, supra,* at 343. Only through such a broad inquiry may courts determine whether a challenged governmental action satisfies the due process requirement of "fundamental fairness."[3] In some instances, the Court has even looked to nonprocedural restraints on official action in determining whether the deprivation of a protected interest was effected without due process of law. *E. g., Ingraham* v.

---

[3] Although, as the majority states, we have held that the minimum requirements of procedural due process are a question of federal law, such a holding does not mean that the procedural protections afforded by a State will be inadequate under the Fourteenth Amendment. It means simply that the adequacy of the state-provided process is to be judged by constitutional standards—standards which the majority itself equates to "fundamental fairness." *Ante,* at 754. I differ, therefore, not with the majority's statement that the requirements of due process present a federal question, but with its apparent assumption that the presence of "fundamental fairness" can be ascertained by an examination which completely disregards the plethora of protective procedures accorded parents by New York law.

*Wright*, 430 U. S. 651 (1977). In this case, it is just such a broad look at the New York scheme which reveals its fundamental fairness.[4]

The termination of parental rights on the basis of permanent neglect can occur under New York law only by order of the Family Court. N. Y. Soc. Serv. Law (SSL) § 384–b.3.(d) (McKinney Supp. 1981–1982). Before a petition for permanent termination can be filed in that court, however, several other events must first occur.

The Family Court has jurisdiction only over those children who are in the care of an authorized agency. N. Y. Family Court Act (FCA) § 614.1.(b) (McKinney 1975 and Supp. 1981–1982). Therefore, the children who are the subject of a termination petition must previously have been removed from their parents' home on a temporary basis. Temporary removal of a child can occur in one of two ways. The parents may consent to the removal, FCA § 1021, or, as occurred in this case, the Family Court can order the removal pursuant to a finding that the child is abused or neglected.[5] FCA §§ 1051, 1052.

---

[4] The majority refuses to consider New York's procedure as a whole, stating that "[t]he statutory provision of right to counsel and multiple hearings before termination cannot suffice to protect a natural parent's fundamental liberty interests if the State is willing to tolerate undue uncertainty in the determination of the dispositive facts." *Ante*, at 758, n. 9. Implicit in this statement is the conclusion that the risk of error may be reduced to constitutionally tolerable levels only by raising the standard of proof—that other procedures can never eliminate "undue uncertainty" so long as the standard of proof remains too low. Aside from begging the question of whether the risks of error tolerated by the State in this case are "undue," see *infra*, at 785–791, this conclusion denies the flexibility that we have long recognized in the principle of due process; understates the error-reducing power of procedural protections such as the right to counsel, evidentiary hearings, rules of evidence, and appellate review; and establishes the standard of proof as the *sine qua non* of procedural due process.

[5] An abused child is one who has been subjected to intentional physical injury "which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emo-

Court proceedings to order the temporary removal of a child are initiated by a petition alleging abuse or neglect, filed by a state-authorized child protection agency or by a person designated by the court. FCA §§ 1031, 1032. Unless the court finds that exigent circumstances require removal of the child before a petition may be filed and a hearing held, see FCA § 1022, the order of temporary removal results from a "dispositional hearing" conducted to determine the appropriate form of alternative care. FCA § 1045. See also FCA § 1055. This "dispositional hearing" can be held only after the court, at a separate "fact-finding hearing," has found the child to be abused or neglected within the specific statutory definition of those terms. FCA §§ 1012, 1044, 1051.

Parents subjected to temporary removal proceedings are provided extensive procedural protections. A summons and copy of the temporary removal petition must be served upon the parents within two days of issuance by the court, FCA §§ 1035, 1036, and the parents may, at their own request, delay the commencement of the factfinding hearing for three days after service of the summons. FCA § 1048.[6] The factfinding hearing may not commence without a determination by the court that the parents are present at the hearing and have been served with the petition. FCA § 1041. At the hearing itself, "only competent, material and relevant evidence may be admitted," with some enumerated exceptions

---

tional health or protracted loss or impairment of the function of any bodily organ." FCA § 1012(e)(i). Sexual offenses against a child are also covered by this category. A neglected child is one "whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent . . . to exercise a minimum degree of care in supplying the child with adequate food, clothing, shelter or education." FCA § 1012(f)(i)(A).

[6] The relatively short time between notice and commencement of hearing provided by § 1048 undoubtedly reflects the State's desire to protect the child. These proceedings are designed to permit prompt action by the court when the child is threatened with imminent and serious physical, mental, or emotional harm.

for particularly probative evidence. FCA § 1046(b)(ii). In addition, indigent parents are provided with an attorney to represent them at both the factfinding and dispositional hearings, as well as at all other proceedings related to temporary removal of their child. FCA § 262(a)(i).

An order of temporary removal must be reviewed every 18 months by the Family Court. SSL § 392.2. Such review is conducted by hearing before the same judge who ordered the temporary removal, and a notice of the hearing, including a statement of the dispositional alternatives, must be given to the parents at least 20 days before the hearing is held. SSL § 392.4. As in the initial removal action, the parents must be parties to the proceedings, *ibid.*, and are entitled to court-appointed counsel if indigent. FCA § 262(a).

One or more years after a child has been removed temporarily from the parents' home, permanent termination proceedings may be commenced by the filing of a petition in the court which ordered the temporary removal. The petition must be filed by a state agency or by a foster parent authorized by the court, SSL § 384–b.3.(b), and must allege that the child has been permanently neglected by the parents. SSL § 384–b.3.(d).[7] Notice of the petition and the dispositional proceedings must be served upon the parents at least 20 days before the commencement of the hearing, SSL § 384–b.3.(e), must inform them of the potential consequences of the hearing, *ibid.*, and must inform them "of their right to the assistance of counsel, including [their] right . . . to have counsel assigned by the court [if] they are financially unable to obtain counsel." *Ibid.* See also FCA § 262.

As in the initial removal proceedings, two hearings are held in consideration of the permanent termination petition.

---

[7] Permanent custody also may be awarded by the Family Court if both parents are deceased, the parents abandoned the child at least six months prior to the termination proceedings, or the parents are unable to provide proper and adequate care by reason of mental illness or mental retardation. SSL § 384–b.4.(c).

SSL § 384–b.3.(f). At the factfinding hearing, the court must determine, by a fair preponderance of the evidence, whether the child has been permanently neglected. SSL § 384–b.3.(g). "Only competent, material and relevant evidence may be admitted in a fact-finding hearing." FCA § 624. The court may find permanent neglect if the child is in the care of an authorized agency or foster home and the parents have "failed for a period of more than one year . . . substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so." SSL § 384–b.7.(a).[8] In addition, because the State considers its "first obligation" to be the reuniting of the child with its natural parents, SSL § 384–b.1.(iii), the court must also find that the supervising state agency has, without success, made *diligent* efforts to encourage and strengthen the parental relationship." SSL § 384–b.7.(a) (emphasis added).[9]

---

[8] As to maintaining contact with the child, New York law provides that "evidence of insubstantial or infrequent contacts by a parent with his or her child shall not, of itself, be sufficient as a matter of law to preclude a determination that such child is a permanently neglected child. A visit or communication by a parent with the child which is of such a character as to overtly demonstrate a lack of affectionate and concerned parenthood shall not be deemed a substantial contact." SSL § 384–b.7.(b).

Failure to plan for the future of the child means failure "to take such steps as may be necessary to provide an adequate, stable home and parental care for the child within a period of time which is reasonable under the financial circumstances available to the parent. The plan must be realistic and feasible, and good faith effort shall not, of itself, be determinative. In determining whether a parent has planned for the future of the child, the court may consider the failure of the parent to utilize medical, psychiatric, psychological and other social and rehabilitative services and material resources made available to such parent." SSL § 384–b.7.(c).

[9] "Diligent efforts" are defined under New York law to "mean reasonable attempts by an authorized agency to assist, develop and encourage a meaningful relationship between the parent and child, including but not limited to:

"(1) consultation and cooperation with the parents in developing a plan for appropriate services to the child and his family;

Following the factfinding hearing, a separate, dispositional hearing is held to determine what course of action would be in "the best interests of the child." FCA § 631. A finding of permanent neglect at the factfinding hearing, although necessary to a termination of parental rights, does not control the court's order at the dispositional hearing. The court may dismiss the petition, suspend judgment on the petition and retain jurisdiction for a period of one year in order to provide further opportunity for a reuniting of the family, or terminate the parents' right to the custody and care of the child. FCA §§ 631–634. The court must base its decision solely upon the record of "material and relevant evidence" introduced at the dispositional hearing, FCA § 624; *In re "Female" M.*, 70 App. Div. 2d 812, 417 N. Y. S. 2d 482 (1979), and may not entertain any presumption that the best interests of the child "will be promoted by any particular disposition." FCA § 631.

As petitioners did in this case, parents may appeal any unfavorable decision to the Appellate Division of the New York Supreme Court. Thereafter, review may be sought in the New York Court of Appeals and, ultimately, in this Court if a federal question is properly presented.

As this description of New York's termination procedures demonstrates, the State seeks not only to protect the interests of parents in rearing their own children, but also to assist and encourage parents who have lost custody of their children to reassume their rightful role. Fully understood, the New York system is a comprehensive program to *aid* parents such as petitioners. Only as a last resort, when "diligent efforts" to reunite the family have failed, does New

---

"(2) making suitable arrangements for the parents to visit the child;

"(3) provision of services and other assistance to the parents so that problems preventing the discharge of the child from care may be resolved or ameliorated; and

"(4) informing the parents at appropriate intervals of the child's progress, development and health." SSL § 384–b.7.(f).

York authorize the termination of parental rights. The procedures for termination of those relationships which cannot be aided and which threaten permanent injury to the child, administered by a judge who has supervised the case from the first temporary removal through the final termination, cannot be viewed as fundamentally unfair. The facts of this case demonstrate the fairness of the system.

The three children to which this case relates were removed from petitioners' custody in 1973 and 1974, before petitioners' other two children were born. The removals were made pursuant to the procedures detailed above and in response to what can only be described as shockingly abusive treatment.[10] At the temporary removal hearing held before the Family Court on September 30, 1974, petitioners were represented by counsel, and allowed the Ulster County Department of Social Services (Department) to take custody of the three children.

Temporary removal of the children was continued at an evidentiary hearing held before the Family Court in December 1975, after which the court issued a written opinion concluding that petitioners were unable to resume their parental responsibilities due to personality disorders. Unsatisfied with the progress petitioners were making, the court also di-

---

[10] Tina Apel, the oldest of petitioners' five children, was removed from their custody by court order in November 1973 when she was two years old. Removal proceedings were commenced in response to complaints by neighbors and reports from a local hospital that Tina had suffered injuries in petitioners' home including a fractured left femur, treated with a homemade splint; bruises on the upper arms, forehead, flank, and spine; and abrasions of the upper leg. The following summer John Santosky III, petitioners' second oldest child, was also removed from petitioners' custody. John, who was less than one year old at the time, was admitted to the hospital suffering malnutrition, bruises on the eye and forehead, cuts on the foot, blisters on the hand, and multiple pin pricks on the back. Exhibit to Brief for Respondent Kramer 1–5. Jed Santosky, the third oldest of petitioners' children, was removed from his parents' custody when only three days old as a result of the abusive treatment of the two older children.

rected the Department to reduce to writing the plan which it had designed to solve the problems at petitioners' home and reunite the family.

A plan for providing petitioners with extensive counseling and training services was submitted to the court and approved in February 1976. Under the plan, petitioners received training by a mother's aide, a nutritional aide, and a public health nurse, and counseling at a family planning clinic. In addition, the plan provided psychiatric treatment and vocational training for the father, and counseling at a family service center for the mother. Brief for Respondent Kramer 1–7. Between early 1976 and the final termination decision in April 1979, the State spent more than $15,000 in these efforts to rehabilitate petitioners as parents. App. 34.

Petitioners' response to the State's effort was marginal at best. They wholly disregarded some of the available services and participated only sporadically in the others. As a result, and out of growing concern over the length of the children's stay in foster care, the Department petitioned in September 1976 for permanent termination of petitioners' parental rights so that the children could be adopted by other families. Although the Family Court recognized that petitioners' reaction to the State's efforts was generally "non-responsive, even hostile," the fact that they were "at least superficially cooperative" led it to conclude that there was yet hope of further improvement and an eventual reuniting of the family. Exhibit to Brief for Respondent Kramer 618. Accordingly, the petition for permanent termination was dismissed.

Whatever progress petitioners were making prior to the 1976 termination hearing, they made little or no progress thereafter. In October 1978, the Department again filed a termination petition alleging that petitioners had completely failed to plan for the children's future despite the considerable efforts rendered in their behalf. This time, the Family Court agreed. The court found that petitioners had "failed in any meaningful way to take advantage of the many social

and rehabilitative services that have not only been made available to them but have been diligently urged upon them." App. 35. In addition, the court found that the "infrequent" visits "between the parents and their children were at best superficial and devoid of any real emotional content." *Id.*, at 21. The court thus found "nothing in the situation which holds out any hope that [petitioners] may ever become financially self sufficient or emotionally mature enough to be independent of the services of social agencies. More than a reasonable amount of time has passed and still, in the words of the case workers, there has been no discernible forward movement. At some point in time, it must be said, 'enough is enough.'" *Id.*, at 36.

In accordance with the statutory requirements set forth above, the court found that petitioners' failure to plan for the future of their children, who were then seven, five, and four years old and had been out of petitioners' custody for at least four years, rose to the level of permanent neglect. At a subsequent dispositional hearing, the court terminated petitioners' parental rights, thereby freeing the three children for adoption.

As this account demonstrates, the State's extraordinary 4-year effort to reunite petitioners' family was not just unsuccessful, it was altogether rebuffed by parents unwilling to improve their circumstances sufficiently to permit a return of their children. At every step of this protracted process petitioners were accorded those procedures and protections which traditionally have been required by due process of law. Moreover, from the beginning to the end of this sad story all judicial determinations were made by one Family Court Judge. After four and one-half years of involvement with petitioners, more than seven complete hearings, and additional periodic supervision of the State's rehabilitative efforts, the judge no doubt was intimately familiar with this case and the prospects for petitioners' rehabilitation.

It is inconceivable to me that these procedures were "fundamentally unfair" to petitioners. Only by its obsessive

focus on the standard of proof and its almost complete disregard of the facts of this case does the majority find otherwise.[11]  As the discussion above indicates, however, such a

---

[11] The majority finds, without any reference to the facts of this case, that "numerous factors [in New York termination proceedings] combine to magnify the risk of erroneous factfinding." *Ante*, at 762.  Among the factors identified by the majority are the "unusual discretion" of the Family Court judge "to underweigh probative facts that might favor the parent"; the often uneducated, minority status of the parents and their consequent "vulnerab[ility] to judgments based on cultural or class bias"; the "State's ability to assemble its case," which "dwarfs the parents' ability to mount a defense" by including an unlimited budget, expert attorneys, and "full access to all public records concerning the family"; and the fact that "natural parents have no 'double jeopardy' defense against repeated state" efforts, "with more or better evidence," to terminate parental rights "even when the parents have attained the level of fitness required by the State." *Ante*, at 762, 763, 764.  In short, the majority characterizes the State as a wealthy and powerful bully bent on taking children away from defenseless parents.  See *ante*, at 761–764.  Such characterization finds no support in the record.

The intent of New York has been stated with eminent clarity: "the [S]tate's *first obligation* is to *help* the family with services to *prevent* its break-up or to *reunite* it if the child has already left home." SSL § 384–b.1.(a)(iii) (emphasis added).  There is simply no basis in fact for believing, as the majority does, that the State does not mean what it says; indeed, the facts of this case demonstrate that New York has gone the extra mile in seeking to effectuate its declared purpose.  See *supra*, at 781–785.  More importantly, there should be no room in the jurisprudence of this Court for decisions based on unsupported, inaccurate assumptions.

A brief examination of the "factors" relied upon by the majority demonstrates its error.  The "unusual" discretion of the Family Court judge to consider the " 'affectio[n] and concer[n]' " displayed by parents during visits with their children, *ante*, at 763, n. 12, is nothing more than discretion to consider reality; there is not one shred of evidence in this case suggesting that the determination of the Family Court was "based on cultural or class bias"; if parents lack the "ability to mount a defense," the State provides them with the full services of an attorney, FCA § 262, and they, like the State, have "full access to all *public* records concerning the family" (emphasis added); and the absence of "double jeopardy" protection simply recognizes the fact that family problems are often ongoing and may in the future

focus does not comport with the flexible standard of fundamental fairness embodied in the Due Process Clause of the Fourteenth Amendment.

### B

In addition to the basic fairness of the process afforded petitioners, the standard of proof chosen by New York clearly reflects a constitutionally permissible balance of the interests at stake in this case. The standard of proof "represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship*, 397 U. S. 358, 370 (1970) (Harlan, J. concurring); *Addington* v. *Texas*, 441 U. S. 418, 423 (1979). In this respect, the standard of proof is a crucial component of legal process, the primary function of which is "to minimize the risk of erroneous decisions."[12] *Greenholtz* v. *Nebraska*

---

warrant action that currently is unnecessary. In this case the Family Court dismissed the first termination petition because it desired to give petitioners "the benefit of the doubt," Exhibit to Brief for Respondent Kramer 620, and a second opportunity to raise themselves to "an acceptable minimal level of competency as parents." *Id.*, at 624. It was their complete failure to do so that prompted the second, successful termination petition. See *supra*, at 781–784 and this page.

[12] It is worth noting that the significance of the standard of proof in New York parental termination proceedings differs from the significance of the standard in other forms of litigation. In the usual adjudicatory setting, the factfinder has had little or no prior exposure to the facts of the case. His only knowledge of those facts comes from the evidence adduced at trial, and he renders his findings solely upon the basis of that evidence. Thus, normally, the standard of proof is a crucial factor in the final outcome of the case, for it is the scale upon which the factfinder weighs his knowledge and makes his decision.

Although the standard serves the same function in New York parental termination proceedings, additional assurances of accuracy are present in its application. As was adduced at oral argument, the practice in New York is to assign one judge to supervise a case from the initial temporary removal of the child to the final termination of parental rights. Therefore,

*Penal Inmates*, 442 U. S., at 13. See also *Addington* v. *Texas, supra,* at 425; *Mathews* v. *Eldridge*, 424 U. S., at 344.

In determining the propriety of a particular standard of proof in a given case, however, it is not enough simply to say that we are trying to minimize the risk of error. Because errors in factfinding affect more than one interest, we try to minimize error as to those interests which we consider to be most important. As Justice Harlan explained in his well-known concurrence to *In re Winship:*

> "In a lawsuit between two parties, a factual error can make a difference in one of two ways. First, it can result in a judgment in favor of the plaintiff when the true facts warrant a judgment for the defendant. The analogue in a criminal case would be the conviction of an innocent man. On the other hand, an erroneous factual determination can result in a judgment for the defendant when the true facts justify a judgment in plaintiff's favor. The criminal analogue would be the acquittal of a guilty man.
>
> The standard of proof influences the relative frequency of these two types of erroneous outcomes. If, for example, the standard of proof for a criminal trial were a preponderance of the evidence rather than proof

---

as discussed above, the factfinder is intimately familiar with the case before the termination proceedings ever begin. Indeed, as in this case, he often will have been closely involved in protracted efforts to rehabilitate the parents. Even if a change in judges occurs, the Family Court retains jurisdiction of the case and the newly assigned judge may take judicial notice of all prior proceedings. Given this familiarity with the case, and the necessarily lengthy efforts which must precede a termination action in New York, decisions in termination cases are made by judges steeped in the background of the case and peculiarly able to judge the accuracy of evidence placed before them. This does not mean that the standard of proof in these cases can escape due process scrutiny, only that additional assurances of accuracy attend the application of the standard in New York termination proceedings.

beyond a reasonable doubt, there would be a smaller risk of factual errors that result in freeing guilty persons, but a far greater risk of factual errors that result in convicting the innocent. Because the standard of proof affects the comparative frequency of these two types of erroneous outcomes, the choice of the standard to be applied in a particular kind of litigation should, in a rational world, reflect an assessment of the comparative social disutility of each." 397 U. S., at 370–371.

When the standard of proof is understood as reflecting such an assessment, an examination of the interests at stake in a particular case becomes essential to determining the propriety of the specified standard of proof. Because proof by a preponderance of the evidence requires that "[t]he litigants . . . share the risk of error in a roughly equal fashion," *Addington* v. *Texas, supra,* at 423, it rationally should be applied only when the interests at stake are of roughly equal societal importance. The interests at stake in this case demonstrate that New York has selected a constitutionally permissible standard of proof.

On one side is the interest of parents in a continuation of the family unit and the raising of their own children. The importance of this interest cannot easily be overstated. Few consequences of judicial action are so grave as the severance of natural family ties. Even the convict committed to prison and thereby deprived of his physical liberty often retains the love and support of family members. "This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody, and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' *Stanley* v. *Illinois,* 405 U. S. 645, 651." *Lassiter* v. *Department of Social Services,* 452 U. S. 18, 27 (1981). In creating the scheme at issue in this case, the New York Legislature

788

was expressly aware of this right of parents "to bring up their own children." SSL § 384–b.1.(a)(ii).

On the other side of the termination proceeding are the often countervailing interests of the child.[13] A stable, loving

[13] The majority dismisses the child's interest in the accuracy of determinations made at the factfinding hearing because "[t]he factfinding does not purport . . . to balance the child's interest in a normal family home against the parents' interest in raising the child," but instead "pits the State directly against the parents." *Ante*, at 759. Only "[a]fter the State has established parental unfitness," the majority reasons, may the court "assume . . . that the interests of the child and the natural parents do diverge." *Ante*, at 760.

This reasoning misses the mark. The child has an interest in the outcome of the factfinding hearing independent of that of the parent. To be sure, "the child and his parents share a vital interest in preventing *erroneous* termination of their natural relationship." *Ibid.* (emphasis added). But the child's interest in a continuation of the family unit exists only to the extent that such a continuation would not be harmful to him. An error *in the factfinding hearing* that results in a failure to terminate a parent-child relationship which rightfully should be terminated may well detrimentally affect the child. See nn. 14, 15, *infra*.

The preponderance-of-the-evidence standard, which allocates the risk of error more or less evenly, is employed when the social disutility of error *in either direction* is roughly equal—that is, when an incorrect finding of fault would produce consequences as undesirable as the consequences that would be produced by an incorrect finding of *no* fault. Only when the disutility of error in one direction discernibly outweighs the disutility of error in the other direction do we choose, by means of the standard of proof, to reduce the likelihood of the more onerous outcome. See *In re Winship*, 397 U. S. 358, 370–372 (1970) (Harlan, J., concurring).

New York's adoption of the preponderance-of-the-evidence standard reflects its conclusion that the undesirable consequence of an erroneous finding of parental unfitness—the unwarranted termination of the family relationship—is roughly equal to the undesirable consequence of an erroneous finding of parental fitness—the risk of permanent injury to the child either by return of the child to an abusive home or by the child's continued lack of a permanent home. See nn. 14, 15, *infra*. Such a conclusion is well within the province of state legislatures. It cannot be said that the New York procedures are unconstitutional simply because a majority of the Members of this Court disagree with the New York Legislature's weighing of the interests of the parents and the child in an error-free factfinding hearing.

homelife is essential to a child's physical, emotional, and spiritual well-being. It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens. The same can be said of children who, though not physically or emotionally abused, are passed from one foster home to another with no constancy of love, trust, or discipline. If the Family Court makes an incorrect factual determination resulting in a failure to terminate a parent-child relationship which rightfully should be ended, the child involved must return either to an abusive home[14] or to the often unstable world of foster care.[15] The reality of these

---

[14] The record in this case illustrates the problems that may arise when a child is returned to an abusive home. Eighteen months after Tina, petitioners' oldest child, was first removed from petitioners' home, she was returned to the home on a trial basis. Katherine Weiss, a supervisor in the Child Protective Unit of the Ulster County Child Welfare Department, later testified in Family Court that "[t]he attempt to return Tina to her home just totally blew up." Exhibit to Brief for Respondent Kramer 135. When asked to explain what happened, Mrs. Weiss testified that "there were instances on the record in this court of Mr. Santosky's abuse of his wife, alleged abuse of the children and proven neglect of the children." Ibid. Tina again was removed from the home, this time along with John and Jed.

[15] The New York Legislature recognized the potential harm to children of extended, nonpermanent foster care. It found "that many children who have been placed in foster care experience unnecessarily protracted stays in such care without being adopted or returned to their parents or other custodians. Such unnecessary stays may deprive these children of positive, nurturing family relationships and have deleterious effects on their development into responsible, productive citizens." SSL § 384-b.1.(b). Subsequent studies have proved this finding correct. One commentator recently wrote of "the lamentable conditions of many foster care placements" under the New York system even today. He noted: "Over fifty percent of the children in foster care have been in this 'temporary' status for more than two years; over thirty percent for more than five years. During this time, many children are placed in a sequence of ill-suited foster homes, denying them the consistent support and nurturing that they so desperately need." Besharov, State Intervention To Protect

risks is magnified by the fact that the only families faced with termination actions are those which have voluntarily surrendered custody of their child to the State, or, as in this case, those from which the child has been removed by judicial action because of threatened irreparable injury through abuse or neglect. Permanent neglect findings also occur only in families where the child has been in foster care for at least one year.

In addition to the child's interest in a normal homelife, "the State has an urgent interest in the welfare of the child." *Lassiter* v. *Department of Social Services*, 452 U. S., at 27.[16] Few could doubt that the most valuable resource of a self-governing society is its population of children who will one day become adults and themselves assume the responsibility of self-governance. "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies." *Prince* v. *Massachusetts*, 321 U. S. 158, 168 (1944). Thus, "the whole community" has an interest "that children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed . . . citizens." *Id.*, at 165. See also *Ginsberg* v. *New York*, 390 U. S. 629, 640–641 (1968).

When, in the context of a permanent neglect termination proceeding, the interests of the child and the State in a sta-

---

Children: New York's Definition of "Child Abuse" and "Child Neglect," 26 N. Y. L. S. L. Rev. 723, 770–771 (1981) (footnotes omitted). In this case, petitioners' three children have been in foster care for more than four years, one child since he was only three days old. Failure to terminate petitioners' parental rights will only mean a continuation of this unsatisfactory situation.

[16] The majority's conclusion that a state interest in the child's well-being arises only after a determination of parental unfitness suffers from the same error as its assertion that the child has no interest, separate from that of its parents, in the accuracy of the factfinding hearing. See n. 13, *supra*.

ble, nurturing homelife are balanced against the interests of the parents in the rearing of their child, it cannot be said that either set of interests is so clearly paramount as to require that the risk of error be allocated to one side or the other. Accordingly, a State constitutionally may conclude that the risk of error should be borne in roughly equal fashion by use of the preponderance-of-the-evidence standard of proof. See *Addington* v. *Texas*, 441 U. S., at 423. This is precisely the balance which has been struck by the New York Legislature: "It is the intent of the legislature in enacting this section to provide procedures not only assuring that the rights of the natural parent are protected, but also, where positive, nurturing parent-child relationships no longer exist, furthering the best interests, needs, and rights of the child by terminating the parental rights and freeing the child for adoption." SSL § 384–b.1.(b).

### III

For the reasons heretofore stated, I believe that the Court today errs in concluding that the New York standard of proof in parental-rights termination proceedings violates due process of law. The decision disregards New York's earnest efforts to *aid* parents in regaining the custody of their children and a host of procedural protections placed around parental rights and interests. The Court finds a constitutional violation only by a tunnel-vision application of due process principles that altogether loses sight of the unmistakable fairness of the New York procedure.

Even more worrisome, today's decision cavalierly rejects the considered judgment of the New York Legislature in an area traditionally entrusted to state care. The Court thereby begins, I fear, a trend of federal intervention in state family law matters which surely will stifle creative responses to vexing problems. Accordingly, I dissent.