OPINION
{¶ 1} Appellants, Joseph Knuckles ("Mr. Knuckles") and Penny Knuckles ("Ms. Knuckles"), appeal the decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of their children to the Butler County Children Services Board ("BCCSB"). For the reasons set forth in this opinion, we reverse the decision of the juvenile court.
 {¶ 2} In February 2000, four children living with Mr. and Ms. Knuckles were removed by BCCSB: Jennifer, Joseph, Johnny, and Ellen Knuckles. Joseph, Johnny, and Ellen are the biological children of Mr. and Ms. Knuckles, while Jennifer is Ms. Knuckles' biological daughter from a previous relationship.
 {¶ 3} At approximately 3:00 a.m. on February 18, 2000, two of the children, Joseph and Johnny, were found walking in the trailer park where Mr. and Ms. Knuckles lived. The children were not wearing shoes and were inadequately dressed for the cold weather that night. The children were able to exit the trailer due to a broken lock on the trailer door. Mr. Knuckles was asleep with the other two children in the Knuckles' trailer at the time. Ms. Knuckles was at her father's trailer at the time. She and Mr. Knuckles had apparently engaged in an argument earlier in the night. City of Oxford police officers testified that Mr. Knuckles smelled of alcohol that night. The officers also testified that the house was very messy and that toys, garbage, and food were on the floor, in addition to live roaches.
 {¶ 4} BCCSB subsequently placed the children in foster care. Mr. and Ms. Knuckles signed a case plan designed to reunify them with the children. Under the case plan, the Knuckles were required to attend parenting classes, participate in the Development of Living Skills Program, refrain from using alcohol and drugs, undergo an alcohol and drug assessment, follow any recommendations based on the alcohol and drug assessment, and maintain a safe housing environment. The Knuckles were granted three-hour supervised visits with the children once per week. Pursuant to the drug and alcohol assessment, the Knuckles were required to attend alcohol treatment sessions several times per week.
 {¶ 5} The Knuckles attended roughly half of their parenting classes and slightly over half of the scheduled visitations. They attended some of the alcohol treatment sessions, but missed the majority of the sessions. The Knuckles reported to BCCSB that they were unable to find transportation to the visits, classes, and treatment sessions that they missed. Neither of the Knuckles has a valid driver's license. The Knuckles live in Oxford, Ohio, while the visitation, classes, and treatment sessions took place in Hamilton, Ohio. The Knuckles participated in the Development of Living Skills Program, which took place in their home.
 {¶ 6} In June 2001, BCCSB moved for permanent custody of the children. A permanent custody hearing was held on March 26, April 3, and April 5, 2002. In September 2002, a juvenile court magistrate issued a decision granting permanent custody of Joseph, Johnny, and Ellen to BCCSB. The decision denied BCCSB's permanent custody motion with respect to Jennifer, but placed her in the temporary custody of her biological father, Willie Oliver. The juvenile court adopted the magistrate's decision in November 2002.
 {¶ 7} Mr. and Ms. Knuckles each appealed the juvenile court's decision. Because their appeals arose out of the same set of facts, this court consolidated their appeals.
 {¶ 8} Mr. Knuckles assigns one error on appeal, while Ms. Knuckles assigns two errors. In Ms. Knuckles' first assignment of error, she argues that the juvenile court erred by failing to file an adoption plan before granting permanent custody. However, this court has held that an agency is not required to file an adoption plan before permanent custody is granted. In re Gang, Clermont App. No. CA2002-04-032, 2003-Ohio-197, at ¶ 39; In re Theaderman (Jan. 18, 2002), Brown App. No. CA2001-04-003; In re Cavender (Mar. 19, 2001), Madison App. No. CA2000-06-037. Therefore, we overrule Ms. Knuckles' first assignment of error.
 {¶ 9} In Ms. Knuckles' second assignment of error, she argues as follows: "The juvenile court erred in finding that it was in the minor children's best interest that they be placed in the permanent custody of BCCSB as the prosecution failed to meet its burden of proof requiring clear and convincing evidence." In Mr. Knuckles' sole assignment of error, he argues as follows: "The juvenile court's decision to grant BCCSB permanent custody is not supported by clear and convincing evidence." Due to their similarity, we will address these two assignments of error together.
 {¶ 10} Natural parents have a constitutionally protected liberty interest in the care and custody of their children. See Santosky v.Kramer (1982), 455 U.S. 745, 753, 102 S.Ct. 1388. A motion by the state for permanent custody seeks not merely to infringe upon that fundamental liberty interest, but to end it. Id. at 759. In order to satisfy due process, the state is required to prove by clear and convincing evidence that the statutory standards have been met. Id. at 769. Clear and convincing evidence requires that the proof produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. In re Rodgers (2000), 138 Ohio App.3d 510, 519, quotingCross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 11} When a state agency moves for permanent custody, the trial court is first required to determine "if it is in the best interest of the child to permanently terminate parental rights and grant permanent custody to the agency that filed the motion." R.C. 2151.414(A)(1). In making this best interest determination, the trial court must consider all relevant factors, including but not limited to the following factors enumerated in R.C. 2151.414(D):
 {¶ 12} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 13} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 14} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 15} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 16} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 17} The juvenile court found that there was clear and convincing evidence in the record that permanent custody for BCCSB was in the best interest of Joseph, Johnny, and Ellen. In making this determination, the juvenile court analyzed the four factors in R.C.2151.414(D)(1)-(4). The court found that none of the factors in R.C.2151.414(E)(7)-(11) applied in the case. That finding is supported by the record.
 {¶ 18} First, the juvenile court analyzed the interaction and interrelationship of the children with their parents, foster parents, and other caregivers. The court noted that while Mr. and Ms. Knuckles' attendance at visitations was inconsistent, the interactions between Mr. and Ms. Knuckles and the children were appropriate. The court noted that Ms. Knuckles was an active participant in the visitations and that a bond existed between Ms. Knuckles and the children. The court also noted that the children were excited about the visits, and became upset, angry, and disappointed when visitations did not occur due to transportation problems. The court stated that the children had also developed bonds with their foster families.
 {¶ 19} Under the second factor, the juvenile court stated that the children were unable to assist the court in making its custody decision due to their young ages and low maturity level. The court noted that the children's guardian ad litem recommended that permanent custody of Joseph, Johnny, and Ellen be granted to BCCSB. The guardian ad litem did not recommend permanent custody to BCCSB for Jennifer, but recommended placement with Jennifer's biological father, Willie Oliver.
 {¶ 20} Under the third factor, the juvenile court stated that the children had been in the custody of BCCSB for more than 12 months in a consecutive 22-month period. The record supports that finding, as the children had been in BCCSB's custody since February 2000.
 {¶ 21} The juvenile court focused most heavily on the fourth factor, the child's need for legally secure permanent placement and whether that type of placement could be achieved without a grant of permanent custody to BCCSB. The court found that it could not. The court first noted that the children's behavior and development had greatly improved while in foster care. The court then noted that the Knuckles had failed to follow through with a large portion of their case plan. According to the court, if given more time, the Knuckles would not be able to provide legally secure permanent placement in their home. As to the Knuckles' transportation problems, the court stated that they did not make use of public transportation available at the time.
 {¶ 22} After a thorough review of the entire record, we do not agree with the juvenile court that the record supports a finding by clear and convincing evidence that permanent custody for BCCSB is in the children's best interest. We do not find in the record clear and convincing evidence that the Knuckles cannot provide a legally secure home for Jennifer, Joseph, Johnny, and Ellen.
 {¶ 23} Analyzing the first factor in R.C. 2151.414(D), the evidence in the record indicates that a significant bond exists between Mr. and Mrs. Knuckles and the children. As the juvenile court found, though the Knuckles' attendance at visitation was inconsistent, their interaction with the children was appropriate. This finding is supported by testimony in the record. The record indicates that the children were excited about their visits with the Knuckles, and very disappointed and upset when those visits did not take place. The record further indicates that the children had bonded well with their foster families, and that their behavior had improved while in foster care.
 {¶ 24} Under the second factor, the guardian ad litem recommended permanent custody to BCCSB for Joseph, Johnny, and Ellen, but did not recommend permanent custody to BCCSB for Jennifer. Under the third factor, the record shows that all the children had been in the custody of BCCSB for more than 12 months in a 22-month period.
 {¶ 25} The fourth factor addresses the children's need for legally secure placement and whether that placement can be achieved without granting permanent custody to the agency. Analyzing this factor requires a determination of whether the Knuckles can provide legally secure placement for the children. The juvenile court determined that the Knuckles could not provide legally secure placement for the children in their home. This finding was largely based on the juvenile court's finding that the Knuckles had not completed a large portion of the case plan.
 {¶ 26} A major reason that the Knuckles did not complete their case plan was that they lacked a reliable form of transportation. As the Knuckles' BCCSB caseworker testified, transportation was an "ongoing concern" throughout the case. Neither Mr. nor Ms. Knuckles has a valid driver's license. The visitations, the parenting classes, and the alcohol treatment sessions took place in Hamilton, Ohio, approximately 15 miles from the Knuckles' home in Oxford, Ohio. Noting the Knuckles' transportation problems, the juvenile court simply stated that the Knuckles failed to make use of public transportation available at the time.
 {¶ 27} The record does not show that BCCSB made any significant efforts to help alleviate the Knuckles' transportation difficulties, a major barrier to reunification. While BCCSB did provide gas vouchers to the Knuckles, the Knuckles do not drive. BCCSB did not provide bus tokens or any other form of transportation assistance to the Knuckles. The Knuckles testified that they attempted to use the BLAST bus service, but that the timing of the bus schedule did not allow them to make it to the visitation on time. Ms. Knuckles testified that BCCSB was a 45-minute walk from the bus stop in Hamilton. Nevertheless, the Knuckles were able to attend over half of the scheduled visits with the assistance of family and friends.
 {¶ 28} Additionally, the record shows that very little effort was made by BCCSB to schedule visitations closer to or in the Knuckles' home. A BCCSB caseworker testified that one unsupervised visit with the children was tried. However, according to the caseworker, unsupervised visits were terminated when the children returned apparently smelling of dog feces and urine. No other attempts were made at visits (supervised or unsupervised) in the Knuckles' home during the approximately 17 months the children were in foster care, despite requests by the Knuckles. Except for one instance in which a BCCSB caseworker noticed dog feces in a back room, no reports of unsanitary conditions at the Knuckles' home appear in the record following the initial removal.
 {¶ 29} The record shows that the Knuckles did comply with parts of their case plan. They participated in the Development of Living Skills Program, which took place in their home. According to testimony at the permanent custody hearing, the Knuckles went as far as they could go in the program. Certain parts of the program had to be completed with the children in the home.
 {¶ 30} Additionally, the record shows that the Knuckles maintained an acceptable home environment. Except for the one incident involving dog feces in a back room, the record shows that the Knuckles maintained a safe and sanitary home following the initial removal. Mr. Knuckles testified that he fixed the broken lock that allowed Joseph and Johnny to leave the house in February 2000. Further, Mr. Knuckles testified that he has been employed the majority of the time the children were in foster care, first at Kroger's, and then in construction.
 {¶ 31} With regard to the issue of alcohol, it is not clear from the record that Ms. Knuckles has significant issues related to alcohol. Dr. Charles Lee testified that, based on his interview with Ms. Knuckles, he was not of the opinion that she had issues of alcohol dependency. Mark Rall, an alcohol and drug counselor at Sojourner, recommended treatment for Ms. Knuckles, but this recommendation was almost entirely based on a BCCSB caseworker's unsubstantiated statement that Ms. Knuckles' understated her alcohol use.
 {¶ 32} We also find no clear evidence in the record that alcohol use affected Mr. Knuckles' ability to provide a legally secure home for the children. Dr. Charles Lee could neither "rule in" nor "rule out" alcohol dependency issues for Mr. Knuckles. Again, Mark Rall of Sojourner recommended alcohol treatment for Mr. Knuckles, but largely based on a conversation with a BCCSB caseworker. That caseworker testified at the permanent custody hearing that he had never observed Mr. Knuckles drinking.
 {¶ 33} We find that the record fails to show that the Knuckles were unable to provide the children with legally secure placement in their home. The record shows that the Knuckles did not have an adequate opportunity to show that they could provide legally secure placement following the initial removal. With this opportunity, the Knuckles can show whether reunification is possible, or whether permanent custody with BCCSB is truly the only possibility.
 {¶ 34} Based on our above analysis, we find the juvenile court's decision that there is clear and convincing evidence in the record that permanent custody is in the children's best interest to be in error. The juvenile court's decision is not supported by the record. The evidence in the record does not meet the "clear and convincing" standard outlined inSantosky v. Kramer, 455 U.S. at 753. Accordingly, we reverse the juvenile court's decision granting permanent custody of Joseph, Johnny, and Ellen Knuckles to BCCSB.
Judgment reversed.
VALEN, P.J., and WALSH, J., concur.