NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

DEPARTMENT OF CHILD SAFETY, S.P., *Appellants*,

*v.*

JUAN P., *Appellee*.

No. 1 CA-JV 18-0015
FILED 5-24-2018

Appeal from the Superior Court in Maricopa County
No. JD 29446
The Honorable Sally Schneider Duncan, Judge

**VACATED AND REMANDED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By JoAnn Falgout
*Counsel for Appellant, Department of Child Safety*

Maricopa County Public Advocate, Mesa
By David C. Lieb
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Presiding Judge Michael J. Brown delivered the decision of the Court, in which Judge Maria Elena Cruz and Judge David D. Weinzweig joined.

---

**B R O W N**, Judge:

¶1            In this appeal we address whether the superior court erred in granting a motion for change of physical custody in this dependency proceeding.  Because no reasonable evidence supports the court's findings, we vacate the court's order and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2            S.P. was born in 2011.  S.P.'s biological father, Juan P. ("Father"), a citizen of Mexico, was convicted in 2005 of a felony involving possession of drugs for sale.  After serving "jail" time, he was arrested in 2012 while on probation and then deported to Mexico; he is not allowed to return to the United States because there is an active warrant for his arrest in California.  S.P. went to live with Father in Mexico for approximately one year when Father was deported in May 2012, but S.P. returned to the United States in May 2013 to visit his mother ("Mother"), who is Father's former girlfriend, when S.P. was two years old.  The visit with Mother turned into an extended stay.  Within a few months, Father lost contact with Mother and S.P. but made no further efforts to find them, other than contacting S.P.'s maternal aunt and uncle once, until mid-2015 when he learned S.P. was in the care of the Department of Child Safety ("DCS").

¶3            Meanwhile, S.P. had moved from California to Arizona with Mother.  In November 2014, DCS took S.P. into care, alleging neglect by Father and neglect, substance abuse, and mental illness by Mother. S.P. was found dependent in February 2015 when both his mother and Father failed to appear, and due to their lack of participation, the superior court accelerated a permanency planning hearing and changed the case plan to severance and adoption.  In August 2015, DCS filed a motion to terminate Father's parental rights based on abandonment.  Father learned that S.P. was in DCS custody in Arizona in April 2015; however, he did not contact DCS until June 2015 and then once again in September 2015.

2

¶4            In April 2016, Father filed a motion under Arizona Rule of Procedure for the Juvenile Court ("Rule") 59, seeking the return of S.P. to Father's custody in Mexico.  S.P. does not speak Spanish nor does he remember living in Mexico.  The superior court initially denied the motion, finding "there would be substantial risk of harm to [S.P.'s] mental or emotional health."  At the same time, however, the court "thought DCS had not met its burden regarding the grounds of abandonment" and thus ordered the parties to submit briefing on that issue in preparation for the next court date.

¶5            After briefing, the superior court reversed its previous Rule 59 ruling and ordered that S.P. be "immediately" returned to Father in Mexico.  S.P. appealed and we vacated the superior court's order that S.P. be returned to Father's physical custody, directing the court to hold a new evidentiary hearing on a Rule 59 motion or conduct a severance trial before S.P. could be moved from Arizona to Mexico.  *See S.P. v. Juan P.*, 1 CA-JV 16-0446, 2017 WL 2125729, at *5, ¶ 20 (Ariz. App. May 16, 2017) (mem. decision).  Before the mandate issued, and without holding an evidentiary hearing, the superior court entered orders dismissing the dependency case, finding that Father was a fit parent, and, again, directed that S.P. be "immediately" returned to Father.  DCS again filed a petition for special action and motion for emergency stay.  We granted the stay and the relief requested in the special action petition, concluding that the superior court lacked jurisdiction to dismiss the dependency case while the prior appeal regarding Rule 59 was still pending.  *See Dep't of Child Safety v. Duncan*, 1 CA-SA 17-0150, 2017 WL 2953353, at *2-3, ¶¶ 6, 13 (Ariz. App. July 11, 2017) (mem. decision).

¶6            In October 2017, the superior court held the evidentiary hearing on Father's second Rule 59 motion to return child, as directed by this court.  DCS opposed the Rule 59 motion, along with S.P.'s guardian ad litem and S.P.'s attorney.  Following the three-day evidentiary hearing, during which the superior court received testimony and reports from three experts, as well as testimony from Father, the DCS caseworker, the foster father, and S.P.'s therapist, the court granted Father's motion.  In its minute entry, the court adopted the reasoning, facts, and law presented in Father's closing argument and reply.  In those filings, Father focused heavily on DCS's conduct and the harm it allegedly caused by failing to follow the court's orders in attempting to reunify S.P. with Father.  Father argued that DCS has created the situation S.P. is currently in by providing "bad information" to service providers and therefore the harm that S.P. suffers is now "unavoidable."  Additionally, Father argued that DCS should have the burden to show that returning S.P. to Mexico would create a substantial risk

of harm to his physical, mental, or emotional health and safety, and DCS failed to meet that burden.

¶7        The superior court provided additional analysis, reasoning in part that DCS "unduly emphasized" the bond between S.P. and his foster placement at the expense of Father's biological bond with S.P., and thus thwarted Father's efforts to reunify with S.P.  The court also focused on Father being a "fit" parent, exceeding "the minimum parenting standards." The court found, by a preponderance of the evidence, that there would be no substantial risk of harm to S.P.'s physical, mental, or emotional health or safety if returned to Mexico.  The court then ordered that DCS "immediately coordinate the return" of S.P. to Father in Mexico with the assistance of the Mexican Consulate no later than 24 hours after the filing of the order.  DCS timely appealed and sought a stay of the Rule 59 order pending the outcome of this appeal, which this court granted.

## DISCUSSION

¶8        Rule 59 provides that a court shall return a child to his or her parent if it "finds, by a preponderance of the evidence, that return of the child would not create a substantial risk of harm to the child's physical, mental or emotional health or safety."  Ariz. R.P. Juv. Ct. 59(E)(1); *see also* Arizona Revised Statutes ("A.R.S.") section 8-861.  We review an order addressing the placement of a child for an abuse of discretion.  *Antonio P. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 402, 404, ¶ 8 (App. 2008).  The superior court has "substantial discretion when placing dependent children because [its] primary consideration in dependency cases is the best interest of the child."  *Id.*  We will not reweigh the evidence because the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings."  *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002).  Thus, we will accept the court's factual findings unless no reasonable evidence supports them. *Id.*  "Legal issues, including the correct legal standard to apply, are reviewed de novo."  *Dep't of Child Safety v. Beene*, 235 Ariz. 300, 304, ¶ 8 (App. 2014).

¶9        DCS argues that no reasonable evidence supports the superior court's finding that sending S.P. to Mexico to live with Father would not create a substantial risk of harm to S.P.'s physical, mental, or emotional health or safety.  DCS further contends that the order is based on legally irrelevant and incorrect information, rather than reasonable evidence.  Father counters, in part, that DCS waived its "reasonable evidence" argument because it failed to specifically urge that argument in

the superior court. We disagree. Father does not cite, nor are we aware of, any authority suggesting a party challenging a court's ruling in a dependency proceeding waives the right to challenge on appeal the sufficiency of evidence supporting that ruling by failing to specifically raise that argument in the superior court. And even assuming a party must do so, DCS complied when it verbally requested judgment in its favor immediately after Father rested his case.

¶10 In Father's closing argument filings, he asserted that because this case is "not typical" and neither Rule 59 nor A.R.S. § 8-861 explicitly establishes which party bears the burden of proof, it is DCS's burden to show that returning S.P. to Mexico would create a substantial risk of harm to his physical, mental, or emotional health. To the extent the superior court placed the burden on DCS, the court erred. DCS, as the non-moving party, is not required to prove the absence of any substantial risk of harm to S.P.'s physical, mental, or emotional health or safety. Nothing in Rule 59 supports Father's suggestion that he does not carry the burden of proof. Moreover, at oral argument before this court, Father's counsel implicitly conceded that Father has the burden when counsel asserted that Father "proved . . . by a preponderance of the evidence . . . that there would be no substantial risk of harm to this child if the child goes home to [him]." Therefore, as the moving party, and the one seeking to have S.P. removed from foster care and returned to his care, Father bears the burden of establishing, by a preponderance of the evidence, that S.P.'s return would not create a substantial risk of harm to his physical, mental, or emotional health or safety. *See Palicka v. Ruth Fisher Sch. Dist. No. 90 of Maricopa Cty.*, 13 Ariz. App. 5, 9 (1970) ("It is the general rule that the party asserting the affirmative of an issue has the burden of proving it."); *cf.* A.R.S. § 25-408(G) (stating that when a court determines whether to allow a parent to relocate a child, the "burden of proving what is in the child's best interests is on the parent who is seeking to relocate the child").

### A. Fit Parent

¶11 In his psychological evaluation with Dr. Carlos Vega, a clinical psychologist, Father stated he felt the need and responsibility to do all he could to get S.P. back into his care. He explained that if he were allowed several visits with S.P., he would be able to realize if S.P.'s return would be injurious to S.P. Father testified that although he speaks very little English and S.P. does not speak any Spanish, he finds it important for parents to be able to communicate with their child. Additionally, Father testified that he has participated in parenting classes and counseling and feels that S.P. will adapt to life in Mexico with him once he is there and is

given attention. According to Dr. Vega, Father loves S.P. and wants the best for him. But Father testified he would still want S.P. to be sent to Mexico to live with him even if a psychologist determined S.P. would be mentally harmed as a result.

¶12        As the superior court concluded, by all accounts Father is a fit parent and is prepared to bring S.P. into his home in Mexico. He participated in a home study, he is currently parenting S.P.'s full and half-siblings, and has adequate income to take on such responsibilities. Although he did not provide supporting documentation, Father has located a school with an English tutor ready for S.P. and he has secured a therapist for S.P. Dr. Vega based his assessment of Father being "more than minimally adequately capable" of parenting S.P. on the "unconditional love" that Father has for him. Dr. Vega, however, never evaluated S.P, and stated he has no specific knowledge of any of the issues, either psychological, behavioral, or otherwise, that S.P. may have. And Dr. Vega acknowledged his assessment would be different if Father would still want S.P. returned to him even if a psychologist determined that S.P. would be mentally harmed. Upon further questioning, Dr. Vega stated he would have "grave concern[s]" and Father's psychological evaluation "would have been a very different" one if Father wanted S.P. returned to him immediately, regardless of the psychological impact he may suffer. He further testified that his assessment of Father being "fit" would "[a]bsolutely" change if Father actually conceded to such a statement.

¶13        The superior court erred to the extent it relied on Father being a "fit" parent when it granted his Rule 59 motion. Rule 59's focus is not on whether a parent is fit, but instead whether there would be a substantial risk of harm to a child's physical, mental, or emotional health and safety if that child is to be returned to their parent. *See* Ariz. R.P. Juv. Ct. 59(E)(1). Indeed, application of the rule in this manner is consistent with Dr. Vega's report, where he concluded that the "issue of reunification is not one of parental competency but rather it is [] one that involves the best interest of the child, which is beyond the scope of this evaluation."

¶14        Additionally, compliance with a case plan does not equate to a finding that a child is not at risk of harm under Rule 59, as this court previously explained. *See S.P.*, 1 CA-JV 16-0446, at *4, ¶ 16. Rather, Rule 59 only requires that the court consider *noncompliance* with a case plan as evidence of a substantial risk of harm. *Id.*; Ariz. R.P. Juv. Ct. 59(D) ("The court shall consider the failure of the parent . . . to comply with the terms of the case plan as evidence that return of the child would create a substantial risk of harm to the child."). As noted in the closing argument submitted by

child's counsel, Father's compliance with services does not establish "any greater or lesser likelihood that a child may be harmed if returned to a parent."

¶15 Based on our review of the appellate briefing, the hearing transcripts and exhibits, the closing arguments, and the superior court's ruling, we are unable to conclude that reasonable evidence supports the court's Rule 59 order. While Father presented some evidence that returning the child to him would not create a substantial risk to the child's physical safety, the record lacks any reasonable evidence showing that returning the child to Father would not create a substantial risk of harm to the child's mental or emotional health.

¶16 Dr. Amber LaMonte, a clinical psychologist, testified that given S.P.'s circumstances, it would be "traumatic" to move him at this point. Her opinion was based in part on her observation of S.P.'s recorded video conference visits with Father, where S.P. appeared very "withdrawn" and would not look up at the camera. S.P.'s foster father also testified that S.P.'s teachers notice when he has such visits with Father. After the visits, S.P. does not want to engage with his teachers, participate in class, and does not get along with the other students as well as he had; S.P. does a "reset" and reverts to his earlier struggles, acting withdrawn and unsocial. Dr. LaMonte concluded that based on current circumstances, S.P. would suffer emotional or mental harm if placed with Father.

¶17 Dr. Elizabeth Capps-Conkle, a licensed psychologist and certified expert trauma professional who performed S.P.'s bonding and best interests evaluations, testified there is an "emotional risk" if S.P. were to be returned to Father in Mexico right now due to Father's lack of emotional attunement and expectations that S.P. would need to make all the adjustments rather than Father making some adjustments to him. In his interview with Dr. Capps-Conkle, S.P. stated he did not want to go to Mexico and if he was ordered by the court to do so, he would tell his "Mom" (indicating his foster mother) and run away when he gets older. According to S.P., he does not want to seek a relationship with Father. S.P.'s therapist, however, encourages S.P. to pursue a relationship with Father but the relationship does not seem to be improving. Dr. Capps-Conkle concluded there would be a "an emotional risk to the child to be sent to Mexico to live with Father without Father making significant improvement in his ability to be emotionally responsive to the child."

¶18 Dr. Capps-Conkle was also concerned with Father's ability to be emotionally responsive to S.P. when Father feels that he has done

everything correct and does not see problems with his interactions with S.P. She acknowledged that additional services, such as a therapist, to help Father and S.P. better communicate, would have been an appropriate service to aid in their communication had such services been provided to them by DCS. Finally, she testified that if Father still wanted S.P. to return to Mexico even if it was determined that moving him would cause risk of substantial harm, such a move could have "long-term effects of . . . depression, anxiety, mental health issue[s], [and] inability to function well academically."

¶19　　　Moreover, no evidence supports the superior court's decision to order the "immediate" return of S.P. to Father. In his April 2017 report, Dr. Vega explained that he "was left with the distinct impression that after 'six or seven visits' [Father] would likely relinquish his parental rights." At the Rule 59 hearing, Dr. Vega testified that any transition S.P. makes would have to be "slow." He explained that he never meant to give the impression that a successful transition would be an immediate one, and that Father's psychological evaluation would be "very different" if Father indicated that he wanted S.P. back "tomorrow." Thus, the superior court's order for immediate return of S.P. goes beyond even what Dr. Vega suggested was appropriate to safeguard S.P.'s mental health.

### B.　　DCS's Conduct

¶20　　　The superior court found that DCS promoted foster placement's bond in an effort to advance their interests in adopting S.P. while simultaneously subordinating Father's fundamental liberty interest in the care, custody, and management of his child. *See Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they . . . have lost temporary custody of their child to the State."). The court also criticized DCS for "comment[ing] in a disparaging manner" about Father living in Mexico and concluded that DCS, based on its "biases and prejudices," is advancing a position that it is within S.P.'s best interests to be raised in the United States over Mexico.

¶21　　　We take no position on DCS's alleged actions, comments, or motives because Rule 59 focuses on the likelihood of a substantial risk of harm to S.P.'s physical, mental, or emotional health or safety. To the extent the court relied on DCS's actions, or lack thereof, as support for granting Father's motion, the court erred. Again, the narrow question in a Rule 59 proceeding does not turn on the fundamental right to parent a child; instead, it is based on the plain language of the rule—whether there is a

substantial risk of harm to the child. *See supra* ¶ 13. To the extent DCS may have failed to comply with the superior court's orders or statutory obligations, the superior court has other options it may rely on to ensure compliance with its orders. But such failures are irrelevant in deciding whether Father met his burden under Rule 59.

### C.     Abandonment

**¶22**          Although there is no motion for termination currently pending in the superior court, the court nonetheless discussed the lack of evidence supporting DCS's theory, based on the prior motion for termination. The court found that DCS "sought persistently and substantially" to restrict Father's access by failing to comply with court orders to put reunification services in place, including visits, Spanish language instruction, and appropriate therapy. The court then implicitly concluded that Father did not abandon S.P., analogizing this case to the attempted severance in *Calvin B. v. Brittany B.*, 232 Ariz. 292, 293, ¶ 1 (App. 2013) ("[A] parent who has persistently and substantially restricted the other parent's interaction with their child may not prove abandonment based on evidence that the other has had only limited involvement with the child.").

**¶23**          In doing so, the superior court failed to acknowledge this court's previous admonition that the superior court erred when it based its 2016 Rule 59 order on the "perceived weakness of DCS's case for abandonment." *S.P. v. Juan P.*, 1 CA-JV 16-0446, at *4, ¶ 15. DCS's likelihood of success on an abandonment ground is immaterial for purposes of determining whether a substantial risk of harm to S.P.'s physical, mental, or emotional health or safety would exist if he is returned to Mexico to live with Father. *See* Ariz. R.P. Juv. Ct. 59(E).[1]

---

[1]        In June 2017, the superior court dismissed the severance motion DCS had filed on August 3, 2015. According to the record before us, DCS has not re-filed its motion for termination; however, it did object to the change of the case plan to family reunification concurrent with severance and adoption. Father asserted in his closing argument that DCS never objected to the change of case plan, but our reading of the June 14, 2017 minute entry reflects that DCS did make an objection. Regardless, the issue before us is change of placement, not whether DCS can prove a statutory ground for severance.

## CONCLUSION

**¶24** The record lacks reasonable evidence showing that the immediate return of S.P. to Mexico to live with Father would not cause a substantial risk of harm to S.P.'s physical, mental, or emotional health and safety. Father therefore failed to meet his burden of proof. Accordingly, we vacate the superior court's Rule 59 order and remand for further proceedings consistent with this decision. We also vacate our February 16, 2018 order granting DCS's motion for stay.



AMY M. WOOD • Clerk of the Court
FILED: AA