NOT DESIGNATED FOR PUBLICATION

No. 119,546

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of L.L.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed December 7, 2018.
Affirmed.

*Michael J. Nichols*, of Michael J. Nichols, P.A., of Kansas City, for appellant natural mother.

*SueZanne M. Bishop*, assistant district attorney, and *Mark A. Dupree Sr.*, district attorney, for
appellee.

Before GARDNER, P.J., ATCHESON and SCHROEDER, JJ.

PER CURIAM: The Wyandotte District Court found L.L., a 12-year-old girl, to be
a child in need of care because L.B., her mother, refused to follow medical advice to give
the child aspirin daily after she had a stroke and later experienced stroke-like symptoms.
L.B. has appealed that determination. Based on the evidence at the adjudication hearing
and the statutory standards for determining neglect and need of care, we find no error and
affirm the district court.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Because the issue on appeal is factually and legally quite narrow, we can quickly
lay out the historical facts. When L.L. was eight years old, she suffered a stroke. L.B.

1

promptly sought medical attention for L.L., and the child apparently suffered no permanent adverse effects. About three months later, L.L. experienced symptoms consistent with a stroke that quickly resolved. Her treating physicians characterized the episode as a transient ischemic attack rather than a full-blown stroke. During that time, pediatric hematologists affiliated with the University of Kansas Medical Center oversaw L.L.'s care. Following L.L.'s stroke, they recommended the girl take two low-dose or baby aspirin a day to reduce the risk of another stroke.

L.B. stopped taking L.L. to the hematologists for follow-up examinations and care in January 2015, a few months after the ischemic attack. At some point, L.B. also stopped giving L.L. aspirin. Testimony at the hearing indicated L.L.'s grandmother continued to give the child aspirin, although not on a daily basis as the physicians recommended.

In August 2017, the Kansas Department of Children and Families received a report of medical neglect regarding L.L. During the Department's investigation, L.B. confirmed that she was no longer giving L.L. aspirin as a stroke preventative. L.B. declined the Department's request that she take L.L. for a medical checkup that would include a determination whether daily aspirin remained an appropriate course of preventive care. As a result, the State filed a petition under the Revised Kansas Code for Care of Children, K.S.A. 2017 Supp. 38-2201 et seq., in October to have L.L. declared a child in need of care—commonly known as a CINC.

The district court held an evidentiary hearing in March 2018 to determine whether L.L. should be adjudicated a CINC. We discuss the salient hearing evidence after outlining legal principles pertinent to CINC adjudications. The district court found L.L. to be a CINC. L.B. has appealed that ruling.

The record on appeal indicates that after the petition was filed, the Department obtained legal custody of L.L. and placed her with a maternal aunt. L.L.'s father died

2

before these proceedings began. As of May 15, 2018, the Department retained legal custody of L.L. but approved her return to L.B.'s physical custody. The case remains active, and L.L.'s present physical custody is unclear from the appellate record.

LEGAL ANALYSIS

*Legal Principles Governing CINC Adjudications*

In broad terms, child in need of care actions rest on the State's *parens patriae* interest in protecting the safety and welfare of children within its jurisdiction. See K.S.A. 2017 Supp. 38-2201(a) (proceedings under Code "deemed to be pursuant to the parental power of the state"); K.S.A. 2017 Supp. 38-2201(b)(1) ("safety and welfare of a child to be paramount in all proceedings under the code"); *In re L.B.*, 42 Kan. App. 2d 837, 842, 217 P.3d 1004 (2009) (recognizing *parens patriae* foundation for proceedings), *rev. denied* 289 Kan. 1278 (2010). A CINC case may culminate in the termination of parental rights if necessary for the wellbeing of the child, thus extinguishing a fundamental constitutional right of a person to raise his or her offspring. See *Santosky v. Kramer*, 455 U.S. 745, 753, 759-60, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (fundamental right); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008) (same); K.S.A. 2017 Supp. 38-2269 (grounds for terminating parental rights).

The adjudication of a child as being in need of care typically comes early in the case and is usually followed by concerted efforts to reunify the family through detailed plans aimed at eliminating the deleterious conditions prompting the initial government intervention. If those efforts fail, the State may move to terminate parental rights. So a CINC adjudication represents an intermediate step in the process. K.S.A. 2017 Supp. 2251. A parent may, nonetheless, appeal the adjudication of his or her child as being in need of care, as L.B. has done. K.S.A. 2017 Supp. 38-2273.

3

In a CINC hearing, the district court must find by clear and convincing evidence that the child meets the statutory definition for being in need of care. K.S.A. 2017 Supp. 38-2250 ("The petitioner must prove by clear and convincing evidence that the child is a child in need of care."); *In re B.D.-Y.*, 286 Kan. at 698-99. That is a comparatively demanding standard of proof exceeding the common civil standard of more probably true than not but lower than the criminal standard of beyond a reasonable doubt. See 286 Kan. 686, Syl. ¶ 2. An appellate court reviewing a CINC adjudication must be convinced, based on the complete evidentiary record viewed in favor of the State as the prevailing party, that a rational fact-finder could have found that determination "highly probable, *i.e.*, [proved] by clear and convincing evidence." 286 Kan. at 705. The appellate court cannot reweigh evidence, redetermine the credibility of witnesses, or redecide factual disputes. 286 Kan. at 705. In other words, we must resolve all evidentiary conflicts in the State's favor and against L.B.

The Code functionally defines "child in need of care" by providing 14 different ways a child may be found in need of care. K.S.A. 2017 Supp. 38-2202(d). A single statutory ground, if proved, is legally sufficient to support a CINC determination. The district court relied solely on K.S.A. 2017 Supp. 38-2202(d)(3) to find L.L. "has been physically . . . neglected" and, thus, became in need of care. The Code, in turn, describes "neglect" to include the "failure to use resources available to treat a diagnosed medical condition [of the child] if such treatment will . . . correct or substantially diminish a crippling condition from worsening." K.S.A. 2017 Supp. 38-2202(t)(3). But the subsection also includes an exemption: A parent will not be considered neglectful for withholding "specified medical treatment" if the parent does so in the course of "legitimately practicing [his or her] religious beliefs." K.S.A. 2017 Supp. 38-2202(t)(3).

4

*Evidence Bearing on L.L.'s Adjudication*

At the adjudication hearing, Dr. Jyoti Panicker, a pediatric hematologist affiliated with the KU Medical Center, testified that she treated L.L. for the stroke and helped manage the child's aftercare. Dr. Panicker prescribed a twice-daily regimen of low-dose aspirin for L.L. to help prevent another stroke. She later revised the recommendation to a single aspirin daily when L.B. balked at giving L.L. any aspirin. At the hearing, L.B. acknowledged both receiving those care instructions from Dr. Panicker and later disregarding them.

After the CINC case had been filed, Dr. Panicker examined L.L. in November 2017—for the first time in more than two and half years. Dr. Panicker testified that a daily aspirin regimen is the best treatment to reduce the risk of a second stroke for a patient who has already had a stroke. She said national studies and the recommendations of medical organizations support the regular use of low-dose aspirin to prevent recurrent strokes. There is a limited risk of ulcers or internal bleeding with repeated use of aspirin. But Dr. Panicker testified she weighed the benefits and risks for L.L. and concluded aspirin provided the greatest medical benefit for L.L. with the least risk. According to Dr. Panicker, L.L. likely has a genetic predisposition to strokes, given her young age for a first stroke and the later ischemic attack, so regulating environmental factors such as diet and exercise may be of limited benefit alone. L.B. testified that she sought to adjust those environmental circumstances and believed those changes were sufficient for L.L.

Dr. Panicker acknowledged that children rarely have strokes, so the clinical studies have looked at the effectiveness of aspirin for adults who have had strokes. She also agreed that the long term effects of an aspirin regimen have not been fully studied. But Dr. Panicker unequivocally stood by her recommendation of daily low-dose aspirin for L.L. as the best preventative care available. No other physician testified at the adjudication hearing.

The evidence at the hearing indicated that L.L. had neither suffered a second stroke nor experienced bleeding or other recognized adverse side effects while taking the aspirin.

At the adjudication hearing, L.B. offered various reasons she stopped giving L.L. aspirin. She agreed she had told investigators she wanted L.L. to be like other children and worried that the aspirin might make L.L. more susceptible to sports injuries or bleeding. L.B. testified that L.L. said the aspirin was giving her headaches. L.B. testified that she related L.L.'s concern to one of the physicians in the hematology group who told her that the aspirin wouldn't cause headaches.

L.B. testified that she later talked to a physician at a clinic about L.L.'s headaches and the physician told her to discontinue the aspirin regimen. The State's lawyer objected to the physician's statements to L.B. as inadmissible hearsay, since the physician was not present and would not be called as a witness. The district court sustained the objection and declined to consider the out of court statements as evidence—a ruling L.B. does not contest on appeal.

Finally, L.B. testified she is a member of the Black Hebrew Israelites denomination and in keeping with her religious beliefs discontinued L.L.'s aspirin regimen. L.B. explained that she discovered the religious practices exemption in the Code and became an adherent of the Black Hebrew Israelites to fit within that statutory exception. She admitted she does not attend church and has no minister. L.B. could not cite any "scripture" or other formal dogma of the denomination that would support her decision to discontinue giving L.L. aspirin. L.B. testified that two friends of hers who are Black Hebrew Israelites do not believe in immunizing their children.

6

The district court found that L.B. failed to show she qualified for the religious exemption for medical care in K.S.A. Supp. 2017 38-2202(t)(3). The district court noted L.B. did not appear to be a practicing member of a Black Hebrew Israelites church and lacked familiarity with any teaching of the denomination that would preclude medical care generally or use of aspirin particularly. The district court construed L.B.'s testimony as demonstrating she found the statutory exemption and then looked for a religion to fit within that provision rather than independently holding religious beliefs qualifying under the statute.

The district court concluded the medical evidence, including Dr. Panicker's testimony, established that L.L. would demonstrably benefit from taking aspirin daily to reduce the chances of having another stroke with comparatively limited risks. So L.B.'s decision to discontinue the aspirin regimen amount to neglect and rendered L.L. a child in need of care.

*Points on Appeal*

On appeal, L.B. asserts two points:  She reiterates her claim for a religious exemption under K.S.A. 2017 Supp. 38-2202(t)(3); and she argues the evidence failed to show the aspirin regimen constituted treatment that would "substantially" keep a "crippling condition from worsening." We disagree.

As to the religious exemption, L.B. offers only a terse argument more or less incorporating the hearing evidence without elaborating on purported flaws in the district court's analysis and conclusion. The district court essentially made a credibility determination against L.B. as to the legitimacy of her ostensible religious objection to giving L.L. aspirin. Without belaboring the hearing evidence, we find no error. L.B. virtually admitted she claimed membership in the Black Hebrew Israelites denomination specifically (and seemingly exclusively) to take advantage of the statutory exemption in

7

the Code. She attended no religious services or ceremonies associated with the religion and could identify no particular tenet in the denomination's teachings prohibiting the use of medications generally or aspirin. The district court ruled well within the evidence and the clear and convincing standard in rejecting L.B.'s claim for a religious exemption.

As to L.B.'s second point, we similarly conclude the district court ruled correctly. The phrasing in K.S.A. 2017 Supp. 38-2202(t)(3) may be quirky—the term "crippling condition" seems almost archaic rather than medically or scientifically descriptive. But we think the legislative intent is clear, particularly in the context of the Code and its overarching purpose in fostering the wellbeing of the state's children. See *In re T.S.*, 308 Kan. 306, 309-10, 419 P.3d 1159 (2018) ("The fundamental rule of statutory interpretation is that legislative intent governs if it can be discerned."). Under the Code, parents render their child in need of care if they fail or refuse to seek out reasonable treatment for the child's significant illnesses or other medical conditions. And they are equally neglectful if they disregard medically appropriate directives or recommendations for important aftercare.

By that measure, L.B. neglected L.L. after the stroke by discontinuing the child's aspirin regimen. The undisputed medical evidence at the hearing demonstrated daily low-dose aspirin to be the most efficacious means of reducing the risk of a second stroke with relatively minimal side effects for the patient. The evidence also showed that L.L. experienced no recognized complications while taking the aspirin immediately following her stroke and apparently hasn't since the start of this case. The consequences of a stroke can be crippling, although L.L. suffered no lasting impairments from hers. While a daily aspirin provides no guarantee against another stroke, it reflects the best available treatment, according to Dr. Panicker. Under the circumstances, L.B. had no sound reason for discontinuing the treatment. Her decision to do so amounts to neglect as defined in K.S.A. 2017 Supp. 38-2202(t)(3), and that neglect, in turn, made L.L. a child in need of care under K.S.A. 2017 Supp.. 38-2202(d)(3).[*]

8

[*]L.L. also would have been in need of care as provided in K.S.A. 2017 Supp. 38-2202(d)(2). That subsection renders children in need of care if they are "without the care necessary for . . . [their] physical, mental or emotional health." The two subsections overlap, and either would be applicable here.

*Conclusion*

Based on the evidence presented at the adjudication hearing and the requirements of the Code, the district court properly found L.L. to be a child in need of care. In affirming the district court's ruling, we have not intended to suggest any views on other issues that might arise as this case continues in the district court.

Affirmed.