NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

KEIRA A., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, A.T., *Appellees.*

No. 1 CA-JV 21-0374
FILED 8-9-2022

Appeal from the Superior Court in Maricopa County
No. JD36457
The Honorable Robert Ian Brooks, Judge

**AFFIRMED**

COUNSEL

Law Office of Denise L. Carroll, Scottsdale
By Denise Lynn Carroll
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Presiding Judge Jennifer M. Perkins delivered the decision of the Court, in which Judge James B. Morse Jr. and Judge Michael J. Brown joined.

---

**P E R K I N S**, Judge:

**¶1**        Keira A. ("Mother") appeals the juvenile court's order terminating her parental rights to her daughter ("Child"), born in 2016. Father is not a party to this appeal. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

**¶2**        In October 2018, Mother and Child lived in an apartment with Child's maternal grandmother ("Grandmother"), Mother's two younger sisters, both minors, and other roommates. One evening, Mother and the roommates began arguing. Mother's thirteen-year-old sister pointed a rifle at the roommates. Mother, Child, and the sisters left the apartment and contacted Grandmother, who picked them up. Grandmother and her husband, Marcus Forrest, later returned and shot at the apartment. Police arrested Mother and the grandparents and contacted the Department of Child Safety ("DCS") to take custody of the three minors, including Child, on an exigent basis. Police investigated Mother but did not charge her with any crimes from the incident. Grandmother admitted her involvement and entered a plea agreement with the State.

**¶3**        DCS filed a dependency petition alleging (1) Mother failed to address her mental-health issues, (2) failed to provide a safe and stable home environment free from domestic violence, abuse, and criminal activity, and (3) failed to provide for Child's basic needs. DCS had learned that Forrest sexually assaulted Mother as a child and at least one of her sisters alleged similar abuse. Despite this history, Grandmother continued to involve Forrest in her life. He sometimes lived in Grandmother's home, which contained unsecured, loaded firearms. Mother chose to live in this unsafe environment with Child and did not address her mental-health issues resulting from childhood abuse. And immediately after the drive-by shooting, DCS could not locate or contact Mother because she was apparently homeless.

**¶4** DCS recommended services to help Mother address these concerns, including a psychological evaluation and trauma therapy counseling, supervised visitation, parent aide services, and transportation. DCS communicated throughout the dependency that Mother needed to demonstrate stability in employment and housing before she could reunify with Child. While Mother made some attempts to participate in services during the first 16 months of the dependency, "her participation was minimal due to pervasive homelessness, instability, and joblessness." In November 2019, DCS petitioned to terminate Mother's parental rights based on Child's length of out-of-home placement and Mother's failure to remedy the circumstances leading to that placement.

**¶5** After a contested three-day termination hearing in 2020, the juvenile court denied the petition because termination was not in Child's best interests. Critical to its determination, the court identified Mother's recent progress in therapy and a hope that it would enable her to maintain housing and employment stability. The court also relied on Mother's "significant bond" with Child, the initial placement's unwillingness to adopt Child, and that the current placement—though willing to adopt— had only been in effect for a few weeks.

**¶6** After the initial termination hearing and throughout 2021, Mother continued to engage in trauma therapy and related services. But she failed to obtain stable housing on her own or maintain a consistent job. In June 2021, DCS again moved to terminate Mother's parental rights based on the length of Child's out-of-home placement.

**¶7** At the termination hearing in December 2021, Mother testified that she only had stable housing between October 2020 and October 2021 when she was living with Grandmother, despite DCS's concerns about Grandmother. In the two months before the hearing, she lived with Grandmother's friend and another individual who could not pass a background check; Mother did not appear on the lease. Mother demonstrated a desire to find stable housing, applying for at least four different shelters and multiple apartments. She was ineligible for the shelters—generally because her circumstances were not bad enough—and was waitlisted for an apartment. The apartment application fees and deposit requirements posed a barrier to Mother's continued efforts.

**¶8** Mother's case manager testified Mother continued to have anger issues and she could not recognize threats or people who are unsafe around Child. Mother's decision to live with Grandmother demonstrated continued disregard for the risks Grandmother posed to Child. Mother

testified she has concerns about Grandmother, wouldn't leave Child alone with Grandmother, and understands why DCS is concerned about Grandmother. But Mother also identified Grandmother as her only source of support and help.

**¶9** The juvenile court found DCS proved the alleged ground for termination, which was in Child's best interests. Mother timely appealed, and we have jurisdiction under A.R.S. §§ 8-235(A), 12-120.21, and 12-2101(A)(1).

## DISCUSSION

**¶10** We review the termination of parental rights for an abuse of discretion. *Titus S. v. Dep't of Child Safety*, 244 Ariz. 365, 369, ¶ 15 (App. 2018). On appeal, due process requires us to assess whether a reasonable factfinder could conclude, based on the record, that the state has met its clear and convincing evidentiary burden to sustain the termination of parental rights. *See Santosky v. Kramer*, 455 U.S. 745, 747–48, 769 (1982). We will uphold the court's findings of fact "if supported by adequate evidence in the record." *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 452, ¶ 19 (App. 2007) (cleaned up). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). We do not reweigh the evidence, but "look only to determine if there is evidence to sustain the court's ruling." *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).

### *Statutory Ground*

**¶11** To terminate the parent-child relationship, the juvenile court must find parental unfitness based on at least one statutory ground under A.R.S. § 8-533(B) by clear and convincing evidence. *See Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005). A court may terminate a parent-child relationship if (1) a child remains in an out-of-home placement for at least fifteen months, (2) DCS "has made a diligent effort to provide appropriate reunification services," (3) the parent has "been unable to remedy the circumstances that cause the child to be in an out-of-home placement," and (4) there is "substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c).

**¶12** The juvenile court concluded that Mother failed to remedy the necessary circumstances because she remained unstable, did not obtain safe

and stable housing, had recent anger issues, and failed to recognize the risk of harm Grandmother poses to both Mother and Child. Mother argues insufficient evidence supports these conclusions.

¶13          Mother acknowledged she did not remedy her lack of stable housing by the time of the hearing. She described her ongoing and numerous attempts to find housing, and the difficult choice she faced between available but unsafe housing with Grandmother and presumably safe but unavailable housing elsewhere.

¶14          The juvenile court concluded that DCS made sufficient efforts to provide reunification services, including "assisting [Mother] with housing resources." Although DCS helped Mother identify potential housing options, nothing in the record suggests DCS offered Mother financial assistance. The legislature authorized DCS to "provide special housing assistance in the form of vendor payments to achieve permanency" for dependent children when "the lack of adequate housing is a significant barrier" to reunification. A.R.S. § 8-462(A). But Mother did not request such assistance, the parties did not discuss this provision, and the court did not consider it. And in this case, Mother had access to shelter—albeit a home that presented a risk of harm to Mother and Child. In other words, Mother's housing issues are inextricably intertwined with DCS's concerns about Grandmother.

¶15          Mother does not argue Grandmother poses no risk. Rather, Mother contends it is unfair to deem her unfit because of Grandmother's criminal conduct and failure to protect Mother from Forrest's abuse. She contends the termination statute does not support termination due to a familial relationship. But Mother fails to engage directly with the juvenile court's conclusions. When asked, Mother could not articulate her own concerns about Grandmother. The court inferred from Mother's testimony that she simply does not recognize the potential harm at issue. We do not second-guess conclusions the court reached from observing witness testimony. *See Jesus M.*, 203 Ariz. at 280, ¶ 4.

¶16          Between Child's removal and the termination hearing, Mother had more than three years to obtain safe and stable housing and to recognize the risks Grandmother posed. Mother's efforts to engage with various services—supervised visitation and trauma therapy in particular—are laudable. But we cannot say that the record lacks sufficient evidence to support the juvenile court's conclusion that she failed to remedy the core issues causing Child's out-of-home placement. The court did not err in

concluding clear and convincing evidence supported the statutory ground for termination of Mother's parental rights to Child.

### *Best Interests*

**¶17**        The juvenile court must also find by a preponderance of the evidence that termination would be in the child's best interests. A.R.S. § 8-533(B); *see also Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 149–50, ¶ 8 (2018). Once a court has found at least one statutory ground to terminate, it may "presume that the interests of the parent and child diverge." *Kent K.*, 210 Ariz. at 286, ¶ 35. We thus focus our inquiry at the best interests stage on "the interests of the child as distinct from those of the parent." *Id.* at 285, ¶¶ 30–31. The "child's interest in stability and security" is the touchstone of our inquiry. *Id.* at 286, ¶ 34. Termination of parental rights is in the child's best interests "if either: (1) the child will benefit from severance; or (2) the child will be harmed if severance is denied." *Alma S.*, 245 Ariz. at 150, ¶ 13.

**¶18**        Mother points to her strong bond with Child and contends the State failed to prove Child would gain an affirmative benefit from termination of Mother's rights. The juvenile court agreed—and the record supports—that Mother and Child share a strong bond. But such a bond cannot overcome Child's need for permanence and stability. Child's out-of-home placement lasted more than three years by the time of the termination hearing. Child is now in an adoptive placement and will thus benefit from termination of Mother's rights. The court did not err in its best interests conclusion.

## CONCLUSION

**¶19**        We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA